**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Roman MAGANA–OLVERA,
Defendant–Appellant.**

No. 88–3280.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 10, 1990.

Decided Oct. 23, 1990.

Louis Daniel Fessler, Yakima, Wash., for defendant-appellant.

Donald E. Kresse, Jr., Asst. U.S. Atty., Yakima, Wash., for plaintiff-appellee.

Before WALLACE, HALL and WIGGINS, Circuit Judges.

CYNTHIA HOLCOMB HALL, Circuit Judge:

Roman Magana–Olvera ("Magana") appeals his convictions resulting from a Drug Enforcement Agency ("DEA") undercover operation in Pasco, Washington. Magana claims that he was tried in violation of The Speedy Trial Act of 1974, 18 U.S.C. §§ 3161–64 (1988). He further claims that the admission of certain hearsay statements at trial violated his sixth amendment right to confront his accusers. Finally, he claims that the district court improperly sentenced him.[1] We affirm in part, reverse in part, and remand for resentencing.

---

**1.** Magana has raised several other issues on appeal, which we have addressed in an unpublished decision.

I

A

As the drug epidemic in Washington has spread to the countryside, the DEA has turned to deputizing state and local police officers by forming regional "task forces." This is the story of an undercover operation conducted by the DEA Tri–City Task Force, which covers the cities of Richland, Pasco, and Kennewick. It all began when one Bobby Zimmerle, a paid informant to the Pasco Police Department, promised to introduce Valerie Mull (another paid informant) to his cousin Ricky Zimmerle, who allegedly dealt in drugs for a major cocaine supplier. Mull made several drug purchases from Ricky and won his trust. Confident that Mull would soon meet Ricky's supplier, the Tri–City Task Force stepped up its involvement.

James Faust, a narcotics officer of the Washington State Patrol and an agent of the DEA Yakima Task Force, received the call to accompany Mull on some drug buys. On the evening of November 3, 1987, Mull and Faust parked in a restaurant parking lot and waited for Ricky Zimmerle. A large surveillance unit was nearby. Ricky soon arrived in his white Pontiac Grand Am with cousin Bobby in the passenger seat. After agreeing to sell Faust two ounces of cocaine, Ricky drove off first to Magana's house, then to Magana's parents' house in the Navy Homes section of Pasco. An unidentified man got in the car at the latter residence. The surveillance unit did not see Magana that night, but Bobby Zimmerle later testified that Magana was the person who got into the Pontiac. Upon returning to the restaurant, Ricky got out of the car, sold Faust two ounces of cocaine for $2,000, and drove off.

On November 10, Ricky struck another deal with Faust in the same parking lot. Once again, Ricky drove off in his white Pontiac. Forty minutes later, the Pontiac returned with Bobby Zimmerle behind the wheel. Behind it, a 1976 white Ford Mustang with darkly tinted windows pulled into the parking lot. Ricky got out of the passenger side. Neither Faust, Mull, nor the officers in the surveillance unit could make out the driver of the Mustang. Evidence at the trial established that it was Magana. After negotiating further with Faust, Ricky consulted with Magana, who remained in the Mustang. He then told Faust to accompany him over to his Pontiac. Once inside the car, Faust purchased roughly four ounces of cocaine for $3,800.

On February 11, 1988, Faust visited Ricky at the Franklin County Jail, where Ricky awaited trial on state robbery charges. Faust's aim was to have Ricky identify his mysterious associate in the November 3 and 10 drug deals. Ricky implicated Magana and stated that his cousin Bobby had seen Magana with a gun on both nights.

Magana was indicted ("*Magana I*") that very day for Conspiracy to Distribute Cocaine and Using a Firearm in Furtherance of a Drug Trafficking Crime in violation of 21 U.S.C. § 846 and 18 U.S.C. § 924(c), respectively.

Several days earlier, Valerie Mull had attempted to telephone Roman Magana at his parents' Navy Homes residence. Magana's fifteen-year-old brother Arnulfo answered the telephone. Arnulfo stated that he was taking care of Roman's business. Subsequently, he gave Mull a one-quarter gram sample of cocaine. Several days later, he sold her a so-called "eight-ball" (3.5 grams of cocaine).

Mull then arranged to buy another eight-ball from Arnulfo on February 22. Detective Henry Montelongo, a Pasco police officer and Tri–City Task Force agent, recorded the serial numbers on the $125 Mull used to make the purchase. At 9:40 that evening, Task Force Agent Robert Rose arrested Magana at his residence. A search of Magana's person produced the $125 in cash Mull had paid Arnulfo earlier that day. Twenty minutes later, the Task Force arrested Arnulfo and found roughly one ounce of cocaine on his person.

B

Magana was arraigned on February 26, 1988. On the day of trial, June 8, he moved to dismiss the Indictment for failure

to bring him to trial within the 70–day period prescribed by the Speedy Trial Act. He also claimed that he had been in custody in excess of the Act's 90–day limit. The district court initially denied the motion. After a recess, the government asked the court to reconsider. The court then dismissed the case without prejudice. The government then requested that Magana remain in custody in light of a detainer which the immigration authorities had already placed upon him. The district court, finding that keeping. Magana would not violate the 90–day confinement rule, declined to release him.

The very next morning, the government filed a second complaint ("*Magana II*") which repeated the first two counts of *Magana I* and added Count Three, use of a juvenile to distribute drugs, in violation of 21 U.S.C. § 845b(a)(1) and Count Four, violation of a deportation order. Count Three was based largely upon conversations informant Mull had had with Magana's 15–year–old brother, Arnulfo. Five days later, on June 14, 1988, the government returned a four-count indictment based upon its complaint.

On July 11, Magana unsuccessfully moved to dismiss *Magana II* for violation of the Speedy Trial Act. He also moved to sever Counts Three and Four. The district court agreed to sever Count Four. The trial began August 24, 1988. The jury convicted Magana on all three remaining counts August 26. He was sentenced October 17, 1988.

## II

Magana first appeals the district court's denial of his motion to dismiss *Magana II* for violation of the Speedy Trial Act. Magana advances three arguments in support of his claim that the Speedy Trial Act 70–

day trial clock should not have been reset after the district court dismissed *Magana I*. We consider them in turn.

We review the district court's application of the Speedy Trial Act de novo; we review its factual findings thereunder for clear error. *United States v. Karsseboom*, 881 F.2d 604, 606 (9th Cir.1989).

### A

Magana first argues that the district court dismissed the indictment upon the government's motion and that therefore the clock was only tolled for the period between dismissal of *Magana I* on June 8, and his arraignment in *Magana II* on June 16. *See* 18 U.S.C. § 3161(h)(6).

### 1

Analysis of this argument requires us to review the pertinent provisions of the Speedy Trial Act. Section 3161(c)(1) requires the defendant's trial to begin within 70 days of the filing of the indictment or the defendant's initial court appearance.[2] Section 3162(a)(2) states that failure to try the defendant before the 70–day clock has expired requires dismissal of the indictment upon the defendant's request. However, that provision allows the district court to dismiss the indictment without prejudice upon consideration of several enumerated factors.[3]

■ Section 3161(d) provides that when an indictment is dismissed on the *defendant's* motion, the subsequent return of a new indictment triggers a new 70–day time period. *See Karsseboom*, 881 F.2d at 606; *United States v. Harris*, 724 F.2d 1452, 1454 (9th Cir.1984); *United States v. McCown*, 711 F.2d 1441, 1446 (9th Cir. 1983). The 70–day clock also starts anew if the district court dismissed the first indict-

2. The Act excludes from the 70–day calculation delays stemming from special circumstances. *See generally* 18 U.S.C. § 3161(h).

3. Section 3162(a)(2) provides, in relevant part: In determining whether to dismiss the case with or without prejudice, the court shall consider, among others, each of the following factors: [1] the seriousness of the offense; [2]

the facts and circumstances of the case which led to the dismissal; and [3] the impact of a reprosecution on the administration of [the Speedy Trial Act] and on the administration of justice.

This language is identical to § 3162(a)(1), which concerns dismissals for violation of the 30–day preindictment clock.

ment *sua sponte.* *See United States v. Feldman,* 788 F.2d 544, 549 (9th Cir.1986), *cert. denied,* 479 U.S. 1067, 107 S.Ct. 955, 93 L.Ed.2d 1003 (1987).

However, if the first indictment is dismissed on the *government's* motion, the statutory time limit is merely suspended until a new indictment is returned; the 70–day clock is not reset. *See* 18 U.S.C. § 3161(h)(6); *Feldman,* 788 F.2d at 548; *McCown,* 711 F.2d at 1446.

### 2

■ Thus the problem before us is one of characterization: at whose behest did the district court dismiss *Magana I* without prejudice? Naturally, Magana claims it was at the government's. He points out that the district court initially rejected his motion to dismiss, and only later dismissed without prejudice when the government asked it to reconsider. Magana therefore claims that under *Harris,* 724 F.2d at 1454, we must find that the district court dismissed the indictment on the government's motion.

We disagree. In *Harris,* the record was unclear upon whose motion the district court acted in dismissing the original complaint without prejudice. We then reasoned that because the defendant had moved for dismissal *with* prejudice, and the government had responded by asking for dismissal *without* prejudice, the district court had acted on the government's motion. *Id.*

Assuming arguendo that this part of *Harris,* is binding,[4] it is inapplicable to our case. In *Harris* we made the inference only because the record did not clearly indicate whose request the court granted. That is not the case here. Not only did the government point out that it was not joining Magana's motion, but the district court later stressed that it was granting "the defendant's motion, [which was] not initiated nor joined in by the Government." Because the record is clear in this regard,

we need not engage in the more speculative analysis used in *Harris.*

### B

■ Magana next contends that the 70–day clock should not have been reset because the dismissal of *Magana I* was based on a violation of the Speedy Trial Act. Specifically, he argues in his brief that "the legislative history behind the Speedy Trial Act implies that the recommencement should occur only when the 'case has been dismissed on *non-speedy trial grounds.*'" (quoting *Feldman,* 788 F.2d at 549) (emphasis in original).

This argument is meritless. In the first place, *Feldman* found the legislative history of the Speedy Trial Act to offer "only marginal guidance"—the above quotation was merely its summary of the government's argument in a case which did not involve an earlier Act violation. *See Feldman,* 788 F.2d at 549.

Second, opinions from other circuits addressing the closely analogous 30–day preindictment clock have held that a dismissal without prejudice for an Act violation does not preclude resetting the clock upon reindictment. The seminal decision in this area is *United States v. Abernathy,* 688 F.2d 576 (8th Cir.1982). Abernathy had moved to dismiss his indictment for mail embezzlement because it had been filed after the 30–day preindictment clock of § 3161(b) had lapsed. After dismissal without prejudice, the government filed a second, identical indictment. Abernathy argued that the preindictment delay was fatal to the second indictment as well. *Id.* at 578.

The Eighth Circuit rejected this claim for two reasons. First, it noted that §§ 3162(a)(1) and 3162(a)(2), respectively, gave the district court power to dismiss, without prejudice, indictments running afoul of either the 30–day or 70–day time periods. *Id.* at 579. Second, the legislative history revealed further support for the view that reprosecution was possible even

---

**4.** We noted in *Harris* that our decision did not hinge on that determination because the second indictment was filed *before* the first was dismissed and thus rendered § 3161(d)(1) inapplicable. Accordingly, our attribution of the dismissal to the government was dictum.

if the government had previously violated the Speedy Trial Act. *Id.* at 579–80 & nn. 6–8. Because the Act specifically provided for reprosecution, the Eighth Circuit saw no reason to forbid clock-resetting under § 3161(d). *Accord United States v. Bittle,* 699 F.2d 1201, 1207 (D.C.Cir.1983).

Although *Abernathy* dealt with the 30–day preindictment clock, its analysis applies with equal force to the 70–day clock at issue in this case. In the first place, the statutory language *Abernathy* analyzed is identical to the language at issue in this case. *See supra* note 3. In addition, we have recently acknowledged the propriety of reprosecution following a violation of the 70–day trial clock. *See United States v. White,* 864 F.2d 660, 661 (9th Cir.1988); *see generally United States v. Taylor,* 487 U.S. 326, 108 S.Ct. 2413, 2419, 2423, 101 L.Ed.2d 297 (1988). Thus, we find no reason not to permit § 3161(d)(1) to reset the 70–day trial clock.

### C

Finally, Magana contends that his continued confinement after the dismissal of *Magana* violated the Speedy Trial Act. He does not refer us to any particular provision of the Act, but merely states that to allow continued detention would pervert the Act's underlying purposes.

This argument is weakest of all. The record clearly indicates that the district court's decision not to release Magana was at least partially based upon an immigration detainer. Because the continued detention was not *solely* because Magana awaited trial on the drug charges, the Act's 90–day confinement clock stopped at the 89th day. *See* 18 U.S.C. § 3164(b).

### III

Magana next appeals the introduction of hearsay statements made by Ricky Zimmerle, who actually sold the cocaine to Detective Faust on November 3 and 10, 1987. This appeal requires us to provide further factual details.

On February 11, 1988, Ricky Zimmerle sat in Franklin County Jail awaiting trial on state armed robbery charges which were unrelated to the November 1987 drug deals. Agent Faust, hoping to obtain the identity of Ricky's supplier, had Ricky released from his cell and led to an interrogation room. Recognizing Faust as the purchaser in the two drug deals, Ricky claimed that he was only a "middle-man." Faust told Ricky that in exchange for his cooperation, he might receive lenient treatment on both the pending state robbery charges and upcoming federal drug charges. Ricky then agreed to cooperate and identified Magana as his supplier for the November 3 and 10 deals. Faust ended the interview at that point and stated that he could not guarantee lenient treatment without first consulting with the United States Attorney.

The following week Faust, accompanied by DEA Special Agent Keith Clements and Task Force Agent Rose, interviewed Ricky again at jail. Ricky repeated his willingness to cooperate with the government in any way he could. Faust responded that a formal agreement would be drawn up between Ricky's counsel and Assistant United States Attorney ("AUSA") Donald Kresse. Ricky then told Faust that Magana had supplied him with cocaine several times over the past year. He added that Magana had been present at both the November 3 and 10 drug deals and that at both times he had been armed with a chrome-plated .45 caliber automatic pistol. He had brought Magana, Ricky continued, because he had been selling on Magana's behalf. Ricky then agreed to testify against Magana.

Several weeks later, in early March, 1988, Faust interviewed Ricky a final time at the office of AUSA Kresse. Ricky repeated his prior story in every respect except one: He admitted that he had not actually seen Magana with a gun. He explained that his cousin Bobby had told him that on November 3, while Ricky stood outside of his Pontiac and spoke to Faust, Magana had brandished the .45 automatic pistol.

Because Ricky promised to testify against Magana, the government did not tape-record any of its three interviews with

him. However Ricky broke his promise on the witness stand. He refused to testify despite repeated warnings that he would face criminal sanctions. Consequently, the government called Agent Faust to the witness stand in order to recount Ricky's hearsay statements during his three pretrial interviews.

Magana claims that this hearsay runs afoul of both the Federal Rules of Evidence and the Constitution. Our task is to determine: (1) whether the hearsay fell within the statement-against-penal-interest hearsay exception of Federal Rule of Evidence 804(b)(3); (2) whether the hearsay was sufficiently reliable not to run afoul of the sixth amendment right to confrontation; and (3) whether the error, if any, was harmless.

## A

Federal Rule of Evidence 804(b)(3) states in pertinent part:

> **Hearsay exceptions.** The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> . . . .
>
> **(3) Statement against interest.** A statement which was at the time of its making ... [one that] so far tended to subject [the declarant] to ... criminal liability ... that a reasonable person in the declarant's position would not have made the statement unless believing it to be true.

The district court found, and neither party disputes, that Ricky Zimmerle, who reneged on his promise to testify, was unavailable within the meaning of Rule 804(b)(3). Thus, the issue becomes whether the statements were sufficiently against Ricky's interest to fall within the purview of the rule.[5] We review the district court's ruling for an abuse of discretion. *See United States v. Slaughter*, 891 F.2d 691, 696–97 (9th Cir.1989); *United States v.*

*Satterfield*, 572 F.2d 687, 690 (9th Cir.), *cert. denied*, 439 U.S. 840, 99 S.Ct. 128, 58 L.Ed.2d 138 (1978).

■ The "against interest" requirement of Rule 804(b)(3) applies not only to confessions of criminal responsibility, but also to remarks that "tend to subject" the declarant to criminal liability. *United States v. Layton*, 720 F.2d 548, 559–60 (9th Cir.1983) (citations omitted), *cert. denied*, 465 U.S. 1069, 104 S.Ct. 1423, 79 L.Ed.2d 748 (1984). Nonetheless, each statement must (1) "solidly inculpat[e]" the declarant and (2) "be one that a reasonable person in the declarant's position would not have made unless it were true." *United States v. Monaco*, 735 F.2d 1173, 1176 (9th Cir.1984). The latter requirement is vital. *See Satterfield*, 572 F.2d at 691 n. 1 (focus is upon a reasonable person in declarant's shoes, not the declarant himself); *Slaughter*, 891 F.2d at 701 (Wallace, J., concurring in part and dissenting in part) (The language of Rule 804(b)(3) "demands more than a showing that the declarant might have been criminally liable. It requires that the statement be made under conditions that suggest the sincerity and reliability of the declarant.").

Neither party disputes that Ricky's remarks tended to subject him to criminal liability. However they hotly dispute the second element—whether a reasonable person in Ricky's shoes would not have made the statements unless true. In deciding this issue, we must consider the circumstances under which Ricky spoke. *See United States v. Candoli*, 870 F.2d 496, 509 (9th Cir.1989).

■ Looking at the circumstances in this case, we conclude that a reasonable person in Ricky's shoes may well have made the statements even if they were not true. A drug dealer who discovers in jail that one of his customers was an undercover agent has a powerful incentive to minimize the

---

**5.** The language of Rule 804(b)(3) adds a further requirement of independent corroboration for statements that tend to exculpate the accused. Here Ricky's statements were purely inculpatory. However, some circuits have extended the corroboration requirement to inculpatory statements as well. *See, e.g., United States v. Riley,* ·

657 F.2d 1377, 1383 (8th Cir.1981); *United States v. Oliver*, 626 F.2d 254, 260 (2d Cir.1980); *United States v. Alvarez*, 584 F.2d 694, 701 (5th Cir.1978). However, this circuit has not resolved the issue. *See United States v. Holland*, 880 F.2d 1091, 1093 (9th Cir.1989). This case does not require us to do so.

damage of an almost certain criminal conviction. That incentive becomes nearly irresistible when the agent uses a federal indictment as a stick, and a promise of leniency as a carrot.[6]

This circuit and others have found similar circumstances so suspicious as to render Rule 804(b)(3) inapplicable. In *Monaco*, we stated:

> Depending upon the circumstances, a purportedly damaging statement may be made with the purpose of placating the authorities or diverting their attention. In particular, "a statement admitting guilt and implicating another, made while in custody, may well be motivated by a desire to curry favor with the authorities and hence fail to qualify as against interest." Fed.R.Evid. 804(b)(3) advisory committee notes. The courts have closely scrutinized statements made while the declarant is in custody and offered against the accused, and have consistently held that the circumstances render such statements unreliable.

735 F.2d at 1176–77 (citation omitted). *Monaco* involved the prosecution of the former owner of a brokerage firm for concealing a Rolls Royce from the firm's bankruptcy creditors. The government sought to introduce hearsay statements by the firm's comptroller, Robert Lyon, that after he had written out a check for the car in the firm's name, Monaco had voided the check and placed the title in his own name. *Id.* at 1174–75. Although the declaration was not made while Lyon was in custody, we noted that Lyon had a strong incentive to minimize his role and shift blame to Monaco. We found the danger of currying favor with the authorities strong enough to find an abuse of discretion under Rule 804(b)(3). *Id.* at 1177.

Other circuits have taken an equally dim view of statements made with an eye to obtaining a "deal" with the government. *See, e.g., United States v. Johnson,* 802 F.2d 1459, 1465 (D.C.Cir.1986) (post-arrest statement not sufficiently against interest because it is "highly logical" for arrestee to trivialize his own involvement by implicating the defendant as the kingpin in a drug operation); *United States v. Palumbo,* 639 F.2d 123, 128 (3d Cir.) (Although certain hearsay statements could have been used to convict declarant for drug conspiracy, the fact that they were made while in police custody created "a very real danger that the motivation for the revelation may not have been to further truth, but to curry favor with the authorities.") (quotation omitted), *cert. denied,* 454 U.S. 819, 102 S.Ct. 100, 70 L.Ed.2d 90 (1981); *United States v. Bailey,* 581 F.2d 341, 345–46 & n. 4 (3d Cir.1978) (statement not sufficiently against interest because declarant was in custody and aware of the possibility of leniency if he confessed and implicated defendant); *United States v. Riley,* 657 F.2d 1377, 1384 (8th Cir.1981) (Because the hearsay statements were made while declarant was in policy custody and warned of the adverse consequences of conviction, the declarant "may well have believed that it was in her best interest to make a statement implicating [the defendant] in order to ingratiate herself with the authorities and divert attention to another."); *United States v. Love,* 592 F.2d 1022, 1025–26 (8th Cir.1979) (same); *United States v. Oliver,* 626 F.2d 254, 261 (2d Cir.1980) (hearsay inadmissible because declarant was in custody and told by FBI agents that his cooperation "would be made known" to U.S. Attorney with an eye toward leniency); *United States v. Sarmiento–Perez,* 633 F.2d 1092, 1102 (5th Cir.1981) ("There were, in addition [to the potentially coercive circumstances of custody], obvious motives for falsification—the very natural desire to curry favor from the arresting officers, the desire to alleviate culpability by implicating others, the enmity often generated in a conspiracy gone awry ... all might lead an arrestee-declarant to misrepresent or exaggerate the role of others in the criminal enterprise...."); *United States v. Gonzalez,* 559 F.2d 1271, 1273 (5th Cir.1977) (Because the prosecutor exerted pressure on

---

**6.** In this case, the government offered to recommend at the conclusion of Ricky's federal drug trial that he serve only half his sentence.

declarant to testify and offer of leniency for cooperation, "whether [the declarant] told the truth or not was incidental to what would happen to him if he did not say *something.*") (emphasis in original).

Under the prevailing view then, Ricky's statements were not sufficiently against his interest because: (1) they were made under custody; (2) they were made in an attempt to curry favor from the federal authorities; (3) the government encouraged his cooperation by suggesting that it could cut his prison time in half if he cooperated; and (4) the statements trivialized Ricky's role in the drug conspiracy by pointing to Magana as the "kingpin." Accordingly, the district abused its discretion in admitting them.

### B

■ Because the admission of Ricky Zimmerele's hearsay was an abuse of the district court's discretion under Federal Rule of Evidence 804(b)(3), it was necessarily a violation of Magana's rights under the confrontation clause of the sixth amendment. *See Candoli*, 870 F.2d at 509 (sixth amendment standard is more strict than Rule 804(b)(3)); *Oliver*, 626 F.2d at 261 (same).

### C

■ Confrontation clause violations are subject to harmless error analysis. Reversal is not required if "the error was harmless beyond a reasonable doubt." *Toolate v. Borg*, 828 F.2d 571, 575 (9th Cir.1987). Thus, the remaining question is whether, in the absence of Ricky's hearsay, there was sufficient evidence to convict Magana of the conspiracy and firearms charges.[7]

### 1.

■ The indictment in *Magana II* alleged that Magana's (1) participation in the November, 1987 drug deals with Agent Faust, and (2) use of his brother Arnulfo in the February, 1988 drug deals with Valerie

Mull, were part of a conspiracy to distribute drugs in violation of 21 U.S.C. § 846. In order to convict Magana of this offense, the government had to prove that Magana (1) agreed to distribute illicit drugs; (2) committed one or more overt acts in furtherance of that purpose; and (3) intended to commit the underlying offense. The government need not have shown an explicit agreement; it could have established it from the circumstances. *See United States v. Melchor–Lopez*, 627 F.2d 886, 890 (9th Cir.1980).

■ The trial record indicates that the government met this burden without the benefit of Ricky Zimmerle's testimony. In the first place, the circumstantial evidence clearly indicated that Magana's role in the November, 1987 drug deals was not insubstantial. Bobby Zimmerle's testimony established that Magana was present at the November 3 and 10 deals. Agent Faust's testimony established that on both nights, Ricky Zimmerle did not produce the cocaine until after he had retrieved Magana. Indeed, on November 10, Ricky handed over the cocaine only after conferring with Magana.

Moreover, the evidence indicated that Magana was also dealing cocaine through his brother Arnulfo in February, 1988. Arnulfo admitted at trial that he told Valerie Mull that he was dealing for his brother. Detective Montelongo testified that he had recorded the serial numbers on the cash with which Valerie Mull had bought cocaine from Magana's younger brother Arnulfo on February 22, 1988. Agent Rose testified that when he arrested Magana later that day, he found the very same $125 in Magana's clothing.

From this evidence a jury could confidently conclude that Magana played a central role in a drug conspiracy. Accordingly, the conspiracy conviction must stand.

### 2.

■ The indictment in *Magana II* also alleged that during Ricky Zimmerle's first

---

7. Because Ricky's hearsay did not refer to Magana's use of his juvenile brother Arnulfo to distribute drugs, our analysis does not extend to

Magana's conviction under 21 U.S.C. § 845b(a)(1).

deal with Agent Faust, Magana used a firearm in violation of 18 U.S.C. § 924(c). To convict Magana of this offense, the government had to prove either that Magana had the gun in his possession, *see United States v. Moore*, 580 F.2d 360, 362 (9th Cir.), *cert. denied*, 439 U.S. 970, 99 S.Ct. 463, 58 L.Ed.2d 430 (1978), or was brought to the crime scene specifically to protect his partners in crime, *see United States v. Mason*, 658 F.2d 1263, 1271 (9th Cir.1981).

 In this case, there is no admissible evidence that Magana either possessed the firearm during the November 3 drug deal or was brought to provide "muscle" for Ricky Zimmerle, who sold the cocaine. The only admissible trial testimony pertaining to the firearms charge came from Bobby Zimmerle. Bobby testified that while he, Ricky, and Magana had sat in Ricky's Pontiac, he had seen a gun lying on the bucket seat adjacent to Magana. Significantly, Bobby admitted that he had not seen the gun in Magana's possession and did not know whether he owned it. Moreover, he did not testify that Magana had been brought to the drug scene in order to protect Ricky Zimmerle during his deal with Faust. Indeed, Bobby testified that he had considered Ricky to be the person in control.

At oral argument, the government conceded that Bobby's testimony was threadbare at best and, if Ricky's hearsay were inadmissible, the firearms conviction cannot stand. We agree. Accordingly, we reverse the conviction.

### IV

 The district court sentenced Magana on October 17, 1988. The Presentence Investigation Report, applying the Sentencing Guidelines promulgated under the Sentencing Reform Act of 1984, 18 U.S.C. §§ 3551–3742 (1988), recommended a range of 84–105 months of total incarceration. The district court declined to follow this recommendation for two reasons. First, it noted that the Ninth Circuit had only recently deemed the Guidelines unconstitutional. *See generally Gubiensio–Ortiz v. Kanahele*, 857 F.2d 1245 (9th Cir.1988),

*vacated sub nom., United States v. Chavez–Sanchez*, 488 U.S. 1036, 109 S.Ct. 859, 102 L.Ed.2d 984 (1989). Second, it stated that even if the Guidelines were valid, upward departure was warranted. The district court then sentenced Magana to concurrent sentences of 15 years for Counts One (conspiracy) and Three (use of a juvenile in drug trafficking). It also imposed a 5–year sentence for Count Two (use of a firearm charge during drug trafficking) to run consecutive to the 15–year sentences. Finally, it imposed a $20,000 fine and a $150 special assessment.

Both Magana and the government seek a remand for resentencing under the Guidelines on the basis that the Sentencing Guidelines apply retroactively to this case.

On August 23, 1988, this circuit deemed the Guidelines unconstitutional. *See Gubiensio–Ortiz*, 857 F.2d at 1266. On January 18, 1989, the Supreme Court held that the Guidelines were in fact constitutional. *See Mistretta v. United States*, 488 U.S. 361, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989). In *United States v. Kane*, 876 F.2d 734, 736 (9th Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 173, 107 L.Ed.2d 130 (1989), we concluded that the Guidelines apply retroactively to the roughly five-month period between *Ortiz* and *Mistretta*. In this light, we agree that the Guidelines apply to Magana's sentencing and remand for resentencing.

### V

For these reasons, the judgment of the district court is AFFIRMED in part, REVERSED in part, and REMANDED.