993 F.2d 886
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Jose German SALGADO, Defendant-Appellant.
 No. 92-30199.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted May 4, 1993.
Decided May 13, 1993.
 
 1
 Before: PREGERSON and KLEINFELD, Circuit Judges, and LEGGE, District Judge.*
 
 
 2
 MEMORANDUM**
 
 OVERVIEW
 
 3
 A jury convicted Jose German Salgado of possession with intent to distribute heroin, in violation of 21 U.S.C. § 841(a)(1). The district court sentenced Salgado to 70 months' imprisonment. Salgado timely appeals his conviction. We have jurisdiction under 28 U.S.C. § 1291. We affirm.
 
 BACKGROUND
 
 4
 On the morning of October 28, 1991, Salgado was driving in southern Oregon with Salvador Herrera Campos, his 17-year-old passenger. Oregon State Police Troopers Markee and Burdick stopped Salgado for failing to maintain a single lane of travel.
 
 
 5
 Trooper Markee recorded the stop in his notebook and gave Salgado a warning regarding the traffic violation. He turned off the overhead lights on his patrol car and told Salgado he was free to leave. Trooper Markee then informed Salgado that drug trafficking was a problem on Oregon highways. Trooper Markee also told Salgado that he suspected that Salgado had drugs in his car. Salgado offered to let Trooper Markee search the car.
 
 
 6
 During his subsequent search of the car, Trooper Markee found a plastic bag containing heroin. He arrested Salgado and Campos and read them their Miranda rights. Salgado and Campos said they understood their rights and each of them asserted his right to remain silent. Upon this request, the troopers ceased asking Salgado and Campos any additional questions.
 
 
 7
 Trooper Markee took Salgado and Campos to the Oregon State Police office in Grants Pass and then to the Josephine County Jail to be fingerprinted. Because Campos was a juvenile, he was taken to a bus station and released. Troopers Markee and Burdick then transported Salgado to the Drug Enforcement Agency ("DEA") office in Medford, Oregon. En route, Trooper Burdick asked Salgado why he was transporting narcotics. Salgado answered, "the same dream of every dumb ass ... easy money."
 
 
 8
 When they arrived at the DEA office, Salgado was placed in the custody of DEA Special Agent Mark DiScenza ("DEA Agent"). Immigration and Naturalization Service Special Agent Lynn Phetteplace ("INS Agent") was also present when Salgado arrived. The DEA Agent re-advised Salgado of his Miranda rights and asked him to cooperate. Specifically, the DEA Agent said "if you cooperate it will be brought to the attention of the U.S. Attorney." But the DEA Agent also stated, "I can't make any promises." Salgado agreed to cooperate, but requested to consult with an attorney. The parties give conflicting accounts of the rest of the encounter between Salgado, the INS Agent, and the DEA Agent.
 
 
 9
 According to the government, the INS agent told the DEA Agent that Salgado's Resident Alien Card did not look fake and left the office to authenticate the card. After the INS Agent left the office, the DEA Agent took Salgado's driver's license and asked Salgado biographical questions to help him complete a biographical information report (DEA 202 form). Before the DEA Agent had completed the report, Salgado stopped answering the questions and said, "call the INS Agent back, my card is good, I'm a legal resident and in a lot of trouble because I was just trying to make some fast money."
 
 
 10
 According to Salgado, the DEA Agent asked him "where he was born, where he is from, and how long he has been here." The INS agent remained in the office and in possession of Salgado's Resident Alien Card when these questions were asked. At some point, the INS Agent said the card may be fake and left the room to check the card's authenticity. Shortly thereafter, Salgado asked the DEA Agent to bring the INS Agent back to the room so Salgado could tell him the card was good. Salgado admits he may have said something to the affect that he is in trouble, but denies ever saying: "I was trying to make some fast money."
 
 
 11
 A federal grand jury issued an indictment charging Salgado with possession with intent to distribute heroin in violation of 21 U.S.C. § 841(a)(1). Salgado filed pretrial motions to suppress the "fast money" statement as well as "the same dream ... easy money" statement, which was made on the way to the DEA office in response to Trooper Burdick's question.
 
 
 12
 The Honorable James A. Redden, U.S. District Judge for the District of Oregon, heard Salgado's motions to suppress. The government conceded before Judge Redden that Trooper Burdick's question was asked in violation of Miranda. Judge Redden ruled that Salgado's "the same dream ... easy money" statement would be suppressed.
 
 
 13
 Regarding the "fast money" statement to the DEA Agent, Judge Redden made no factual finding on which party's account about the INS Agent was correct. He held that whether the INS Agent said Salgado's immigrant card was good or fake before he left the room, Salgado's subsequent statement was voluntary and spontaneous, and therefore admissible.
 
 
 14
 Salgado filed a motion to reconsider. The trial judge, the Honorable Michael R. Hogan, U.S. District Judge for the District of Oregon, heard Salgado's motion to reconsider. Judge Hogan sustained Judge Redden's ruling admitting the "fast money" statement and denied Salgado's motion to reconsider.
 
 
 15
 At trial, Guadalupe Herrera testified on Salgado's behalf. Herrera is Salgado's girlfriend and the mother of his two children. She is also the older sister of Campos, Salgado's 17-year-old companion. Salgado attempted to admit Herrera's testimony regarding a statement made to her by Campos. According to Herrera, Campos told her that Salgado knew nothing about the heroin found in the car and that the heroin belonged to Campos.
 
 
 16
 Judge Hogan ruled that Herrera's testimony regarding Campos's statement was inadmissible as hearsay. He found that Campos's statement was not admissible as an exception to the hearsay rule under Federal Rule of Evidence 804(b)(3) (statement against interest) because the statement lacked sufficient indicia of reliability.
 
 
 17
 The jury found Salgado guilty as charged. Judge Hogan subsequently sentenced Salgado to 70 months' imprisonment under the Sentencing Guidelines.
 
 
 18
 On appeal, Salgado challenges (1) Judge Redden's pretrial denial of his motions to suppress, and (2) Judge Hogan's exclusion at trial of Herrera's testimony regarding Campos's statement, which exculpated Salgado.
 
 ANALYSIS
 
 19
 I. Did the district court err by denying Salgado's motion to suppress his statement made to the DEA Agent?
 
 
 20
 We review de novo the district court's denial of a motion to suppress. See United States v. Homick, 964 F.2d 899, 903 (9th Cir.1992).
 
 
 21
 In analyzing whether a defendant's incriminating statement should be suppressed, we first determine whether the statement was made in violation of the defendant's rights under Miranda v. Arizona, 384 U.S. 436 (1966). If violations did not occur under Miranda, we then determine whether the statement was voluntary, i.e., not the product of coercion. Medeiros v. Shimoda, 889 F.2d 819, 823 (9th Cir.1989), cert. denied, 496 U.S. 938 (1990).
 
 A. Violations under Miranda
 
 22
 1. Was the "fast money" statement obtained through custodial
 
 
 23
 interrogation in violation of Miranda?
 
 
 24
 Once the defendant has invoked his right to remain silent or his right to counsel, custodial interrogation must cease. Miranda, 384 U.S. at 473-74. We review for clear error the district court's determination whether a defendant was subjected to custodial interrogation. United States v. Gonzalez-Sandoval, 894 F.2d 1043, 1046 (9th Cir.1990) (citations omitted).
 
 
 25
 Neither party disputes that Salgado was in "custody" when the "fast money" statement was made. However, Salgado argues that the biographical questions asked after he asserted his rights to remain silent and to counsel constitute "interrogation." The government contends that the questions did not constitute "interrogation," but were asked merely to complete a routine biographical information report.
 
 
 26
 Not every question asked in a custodial setting constitutes interrogation. United States v. Mata-Abundiz, 717 F.2d 1277, 1278 (9th Cir.1983) (citing United States v. Booth, 669 F.2d 1231, 1237 (9th Cir.1981)). Questions asked while in custody constitute interrogation if under all the circumstances involved in a given case, the questions are reasonably likely to elicit an incriminating response from the suspect. Rhode Island v. Innis, 446 U.S. 291, 301 (1980); Gonzalez-Sandoval, 894 F.2d at 1046.
 
 
 27
 Generally, routine gathering of biographical data does not constitute "interrogation." United States v. Perez, 776 F.2d 797, 799 (9th Cir.1985); Mata-Abundiz, 717 F.2d at 1280; Booth, 669 F.2d at 1238. See also Pennsylvania v. Muniz, 496 U.S. 582 (1990) (although the defendant had not received Miranda warnings, his answers to routine questions about his name, address, height, weight, eye color, date of birth, and current age did not constitute interrogation). Biographical questions, however, may be classified as "interrogation" where the biographical information elicited is reasonably likely to inculpate the respondent. Gonzalez-Sandoval, 894 F.2d at 1046. We look at the relationship between the questions asked and the suspect's alleged crime to determine whether the questions were reasonably likely to elicit an incriminating response. Mata-Abundiz, 717 F.2d at 1280 (citations omitted).
 
 
 28
 Salgado was arrested for possession of heroin. Asking a legal immigrant questions about where he was born, where he is from, and how long he has been in this country is unlikely to lead to answers which could be used against him at trial for a charge of drug trafficking. Specifically, the questions asked by the DEA Agent were not reasonably likely to elicit the statement made by Salgado: "I'm ... in a lot of trouble because I was just trying to make some fast money."
 
 
 29
 Salgado further argues that if the questions by themselves were not interrogation the questions in addition to the INS Agent leaving the room with Salgado's Resident Alien Card should be considered interrogation. However, in the cases cited by Salgado to support this contention, the defendant had been asked questions that go directly to an element of the offense.[1]
 
 
 30
 Hence, we conclude that the district court did not err when it held that Salgado's statement was spontaneous and not elicited as a result of a custodial interrogation.
 
 
 31
 2. Was Salgado's "fast money" statement part of his request
 
 
 32
 for counsel?
 
 
 33
 Salgado argues that his statement "fast money" should be suppressed because this statement was intertwined with his request for counsel. But the sole case he cites to support his assertion is from the Fifth Circuit and is clearly distinguishable. See United States v. Johnson, 558 F.2d 1225 (5th Cir.1977).
 
 
 34
 In Johnson, the defendant's statements that the government attempted to introduce were coupled with an expressed desire to remain silent. Id. at 1228-1229. In contrast, Salgado's "fast money" statement was separate from his request for counsel made several minutes earlier. Hence, we do not find his request for counsel and his statement to be "a single testimonial entity." Id. at 1229.
 
 3. Did the earlier conceded Miranda
 
 35
 violation taint Salgado's subsequent "fast money"
 
 
 36
 statement?
 
 
 37
 Salgado also argues that the "fast money" statement should be suppressed because it was tainted by the earlier "easy money" statement, which was obtained in violation of Miranda. A defendant's voluntary statement inadmissible solely on the ground of a Miranda violation does not taint a subsequent voluntary statement. Oregon v. Elstad, 470 U.S. 298, 306, 309 (1985); Gonzalez-Sandoval, 894 F.2d at 1049; Medeiros, 889 F.2d at 823-825; United States v. Wauneka, 770 F.2d 1434, 1440 (9th Cir.1985).
 
 
 38
 Salgado contends that insufficient time had passed between Salgado's inadmissible statement to Trooper Burdick and the DEA Agent's re-advisement of Salgado's Miranda rights. But Salgado does not contend that his earlier "easy money" statement to Trooper Burdick was involuntary or coerced.
 
 
 39
 Therefore, we suppress the "fast money" statement only if we find that it was not voluntarily made. Gonzalez-Sandoval, 894 F.2d at 1049.
 
 B. Voluntariness of the Statement
 
 40
 We review de novo whether the defendant's inculpatory statement was voluntary. Greenawalt v. Ricketts, 943 F.2d 1020, 1027 (9th Cir.1991), cert. denied, 113 S.Ct. 252 (1992). We review the district court's findings of fact regarding defendant's statement under the clearly erroneous standard. United States v. Wolf, 813 F.2d 970, 974 (9th Cir.1987).
 
 
 41
 Before a criminal defendant's statement can be used against him, the government must prove by a preponderance of the evidence that the statement was voluntary. Colorado v. Connelly, 479 U.S. 157, 168-69 (1986); United States v. Leon Guerrero, 847 F.2d 1363, 1365 (9th Cir.1988). An inculpatory statement is voluntary only when it is the product of a rational intellect and a free will. Medeiros, 889 F.2d at 823; Leon Guerrero at 1365 (citing Blackburn v. Alabama, 361 U.S. 199, 208 (1960)). Hence, the government must prove that it did not obtain the statement through physical or psychological coercion or by improper inducement, so that the suspect's will was overborne. Haynes v. Washington, 373 U.S. 503, 513-14 (1963).
 
 
 42
 No one factor is determinative. Instead, the "totality of the circumstances," must be considered, including the characteristics of the accused and the details of the interrogation. Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973). However, a confession is voluntary unless there is "[c]oercive police activity." Connelly, 479 U.S. at 167.
 
 
 43
 Salgado contends that he was coerced into making the inculpatory statement. He asserts that the INS Agent's statement that Salgado's Resident Alien Card may be fake followed by the INS Agent leaving the room with Salgado's card while the DEA Agent continued to ask questions created a coercive atmosphere. According to Salgado, these actions created an implied threat that Salgado would not see his immigration papers again if he asserted his right to counsel and did not cooperate.
 
 
 44
 Even if these facts were true, Connelly, 479 U.S. 157, and its Ninth Circuit progeny require the "coercive police activity" to be more than the implied threat alleged by Salgado. See Shedelbower v. Estelle, 885 F.2d 570, 573-74 (9th Cir.1989), cert. denied, 111 S.Ct. 975 (1991) (confession voluntary despite the false claim by the police that the victim had identified the defendant when she had not). Furthermore, there is no indication that the DEA Agent used the earlier "easy money" statement to Trooper Burdick, to extract Salgado's incriminating "fast money" statement or otherwise pressure him to admit his guilt. See Gonzalez-Sandoval, 894 F.2d at 1049; Medeiros, 889 F.2d at 824-825.
 
 
 45
 Hence, we conclude that the district court did not err when it held that Salgado's "fast money" statement was voluntary.
 
 
 46
 II. Did the district court err by finding that Herrera's testimony was inadmissible?
 
 
 47
 We review de novo the district court's construction of the Federal Rules of Evidence. We review for abuse of discretion the district court's decisions to admit or exclude evidence. United States v. Magana-Olvera, 917 F.2d 401, 407 (1990); United States v. Satterfield, 572 F.2d 687, 690 (9th Cir.), cert. denied, 439 U.S. 840 (1978).
 
 
 48
 Under Federal Rule of Evidence 804(b)(3), hearsay is admissible if: (1) the declarant is unavailable; (2) a reasonable person in the declarant's position would not have made the statement unless he believed it to be true because the statement would tend to subject the declarant to criminal liability; and (3) corroborating circumstances clearly indicate the trustworthiness of the statement. Satterfield, 572 F.2d at 691.
 
 
 49
 Assuming elements (1) and (2) were satisfied, Salgado did not offer any evidence to corroborate the trustworthiness of the statement. The statement was offered by Salgado's girlfriend in an attempt to exculpate Salgado, the father of her children. Therefore, she would have a compelling reason to offer testimony that could help free Salgado. We conclude that the district court did not abuse its discretion by excluding Campos's statement because it lacks sufficient indicia of reliability and trustworthiness.
 
 
 50
 Affirmed.
 
 
 
 *
 Honorable Charles A. Legge, United States District Judge for the Northern District of California, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 In Gonzalez-Sandoval, 894 F.2d 1043, the defendant was charged with illegal entry and being a deported alien found in the United States. In Mata-Abundiz, 717 F.2d 1277, the defendant was charged with possession of a firearm by an alien. In contrast to this case, the questions asked about alienage in Gonzalez-Sandoval and Mata-Abundiz were highly relevant to the crime suspected