133 F.3d 930
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Thomas Wayne MARCEAU, Defendant-Appellant.
 No. 97-30089.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Dec. 2, 1997.
Decided Dec. 17, 1997.
 
 Before REAVLEY,** BOOCHEVER and KLEINFELD, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 This is an appeal from the conviction of Thomas Wayne Marceau for the voluntary manslaughter of Aaron North Piegan. We affirm.
 
 BACKGROUND
 
 3
 At around 10:00 p.m. on June 16, 1996, a group of seven or eight people, including Aaron Piegan, broke the windows in Thomas Marceau's home. Marceau, who had been drinking throughout the evening, was angry when he arrived home. Several neighbors heard Marceau threaten to kill whoever broke the windows.
 
 
 4
 After being told that Piegan and his friends had been with the gang that broke the windows, Marceau and members of his family started chasing Piegan and the others. At some point, everyone dropped out of the chase except Marceau and Piegan.
 
 
 5
 Ken Bostwick and Joe Bull Shoe were driving around downtown Browning together that night in a pick-up truck. Bostwick and Bull Shoe saw Marceau chasing a kid wearing black clothing near the IGA store. They saw the kid and Marceau run into the alley behind the store. Bostwick and Bull Shoe lost sight of both Marceau and the kid for several minutes. During this time, they stopped and talked to Melinda Juneau, Bostwick and Bull Shoe continued to drive around, now followed by Juneau, Bostwick saw the kid in black running by the side of the store, and stated that Marceau was coming from the same direction as the kid when Bostwick, Bull Shoe and Juneau saw him. Bostwick, Bull Shoe, and Juneau saw the kid in black stagger to the front doors of the IGA Store and pound on the doors. They then saw him fall flat on his face without breaking his fall. Piegan was found dead in front of the IGA Store, wearing black clothing.
 
 
 6
 Marceau waved Bostwick and Bull Shoe to pull over and give him a ride. Juneau saw Marceau get into the truck, with them. Bull Shoe was driving and Bostwick was sitting in the middle next to Marceau. Marceau pounded the dashboard with his fist three times, exclaiming, "I hit him" each time. Bull Shoe did not hear what Marceau said, but did see him hit the dashboard. Bostwick saw a serrated-edged knife in Marceau's hand. The next day, Marceau told Bostwick and Bull shoe not to say anything about the night before because he (Marceau) was suspected in the killing of Piegan.
 
 
 7
 Piegan's death was caused by a two-edged knife, approximately five inches long. The murder weapon was never recovered.
 
 DISCUSSION
 
 8
 Marceau challenges his conviction on six separate grounds, individually discussed below.
 
 I. Admissibility of hearsay statements
 
 9
 Marceau offered the testimony of two brothers, Gilbert and Marcus Spotted Bear. The brothers invoked the Fifth Amendment outside the presence of the jury and refused to testify. Marceau then wanted to put on three witnesses, Garrett Renville, Shelley Mad Plume, and Jolita Medicine Cree, to testify as to statements the Spotted Bear brothers made to thenm. They testified outside of the presence of the jury, and the judge ruled that their testimony was inadmissible hearsay.
 
 
 10
 Exclusion of testimony is reviewed for abuse of discretion.[1] The district court's discretion is limited by the defendant's due process right to present a defense.[2]
 
 
 11
 Garrett Renville, a friend of the Spotted Bear brothers, testified that the day after Piegan was killed, Gilbert Spotted Bear told Renville that he had killed Piegan. Later, in the same conversation, Gilbert told Renville that he was joking. In the same conversation, Gilbert told his brother, in Renville's presence, that Manuel No Runner had killed Piegan and had tried to give him (Gilbert) a gun.
 
 
 12
 Shelley Mad Plume, a relative of the Spotted Bear brothers, testified that, approximately four months after Piegan's death, Marcus Spotted Bear told her that he had Piegan's knife and shirt. On a different occasion, around the same time, Gilbert told Mad Plume that someone told him that Manuel No Runner and Jimmy Marceau (Thomas Marceau's other) killed Piegan. Shelley Mad Plume is Marceau's cousin.
 
 
 13
 Jolita Medicine Cree, Gilbert's second cousin, testified that, approximately three months after Piegan's death, Gilbert told her that he stabbed Piegan, washed his body off in a bath tub, and then placed his body in front of the IGA store, where it was found. Gilbert was drunk when he made this statement. The next day, Gilbert told Jolita that he had been joking. Approximately one month later, Gilbert told Jolita that Manuel No Runner and Jimmy Marceau had killed Piegan.
 
 
 14
 Marceau argued that the witnesses' testimony should be admitted under the exception to the hearsay rule for statements against penal interest. Under Rule 804(b)(3) of the Federal Rules of Evidence, hearsay is admissible if the proponent can show that: "(1) the declarant is unavailable as a witness; (2) the statement so far tended to subject the declarant to criminal liability that a reasonable person in the declarant's position would not have made the statement unless he believed it to be true; and (3) corroborating circumstances clearly indicate the trustworthiness of the statement."[3] The Government concedes that the first element is met because the Spotted Bear brothers invoked their right against self-incrimination.
 
 
 15
 To satisfy the second element, the statement must solidly inculpate the declarant and be one that a reasonable person in the declarant's position would not have made unless it were true.[4] However, several of the statements tended to subject Manuel No Runner to criminal liability more than the Spotted Bear brothers.
 
 
 16
 The third requirement of Rule 804(b)(3) was not met. That element is that corroborating circumstances clearly indicate the trustworthiness of the statement.
 
 
 17
 Gilbert admitted killing Piegan to Renville the day after the stabbing. In the same conversation, however, he retracted the admission, claiming that he was only joking, and identified Manuel No Runner as the real killer. He also stated that No Runner wanted to give him a gun. The uncontradicted evidence is that Piegan was stabbed, not shot. Moreover, no evidence supports Gilbert's story to Jolita Medicine Cree of moving Piegan's body and washing it. Additionally, Gilbert retracted his story the next day. Marcus Spotted Bear's claim that he had Piegan's knife and shirt are also uncorroborated. Piegan's body was fully clothed when found in front of the IGA.
 
 
 18
 On cross examination, Gilbert Spotted Bear admitted that Marceau's mother had gone to the Spotted Bear house to talk to his brother, Marcus. Although Gilbert could not remember when Mrs. Marceau had come to his house, the thought the meeting occurred in September or October, the same time frame in which the Spotted Bear brothers made the statements to Shelley Mad Plume and Jolita Medicine Cree about Piegan's death. Although Marceau argues that the brothers had no reason to fabricate the stories, this fact casts doubt on that claim.
 
 
 19
 In summary, there was no independent evidence to support the hearsay statements; in fact, the statements contradicted the physical evidence in the case. The declarants might have had a reason to fabricate the stories. The stories themselves were inconsistent with each other. Although the statements might exculpate Marceau, the district court acted within its discretion to exclude them as hearsay.
 
 II. Sufficiency of the evidence
 
 20
 Because Marceau moved for acquittal at the close of all the evidence, the standard of review is de novo.[5] Sufficient evidence exists if viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[6]
 
 
 21
 Several people testified that they heard Marceau make threats against the people who broke his windows. Additionally, the Government put on three witnesses to the stabbing. Joe Bull Shoe and Ken Bostwick saw Marceau near the IGA chasing a kid in black. Bostwick saw the kid go into the alley, and assumed that Marceau went into the alley because there was no where else to go and Marceau disappeared. Several minutes later, Bostwick saw the kid in black running out of the alley, followed by Marceau who was walking. Bostwick, Bull Shoe and Melinda Juneau saw the kid in black pounding on the windows of the IGA, and then fall flat on his face without breaking his fall Piegan was found dead in front of the IGA dressed in black clothing.
 
 
 22
 Marceau was picked up by Bull Shoe and Bostwick. Bostwick, who was sitting next to Marceau, saw a knife in Marceau's fist. Both Bostwick and Bull Shoe testified that Marceau pounded on the dashboard exclaiming, "I hit him" three times in succession.
 
 
 23
 A conviction can be sustained on circumstantial evidence,[7] and the evidence is sufficient to affirm the verdict.
 
 
 24
 III. Refusal to instruct the jury on self-defense
 
 
 25
 A defendant is entitled to have the judge instruct the jury on his theory of defense provided that it is supported by the law and has some foundation in the evidence. Whether there is sufficient factual support for the requested instruction is reviewed for an abuse of discretion.[8] The "merest scintilla of evidence" is not sufficient to warrant an instruction on self defense--there must be sufficient evidence upon which the jury could rationally sustain the defense.[9] If there was sufficient evidence, then the failure to instruct is not harmless error.[10]
 
 
 26
 Self defense is a use of force that is justified "when a person reasonably believes that it is necessary for the defense of oneself or another against the immediate use of unlawful force."[11]
 
 
 27
 No one witnessed the stabbing, and Marceau exercised his right not to testify. in support of the instruction, there was testimony that Piegan possessed a two-edged knife, and there was evidence that this was the type of weapon that was used to kill him. Marceau argues that it would be reasonable to believe that Piegan crew his knife on Marceau, and Marceau used it to kill Piegan in self defense. However, the actual murder weapon was never recovered, so it is unknown if Piegan's own knife actually was the one used to kill him. In view of the evidence that Marceau was the aggressor, chased the boy with the purpose of killing him, and that he described the blows with no reference to self defense, the evidence that Piegan was killed with his own knife was no more than the "merest scintilla of evidence" of self defense.
 
 
 28
 IV. Reasonable doubt instruction.
 
 
 29
 Whether a jury instruction was an accurate statement of the law is reviewed de novo.[12] The court looks to whether, " 'viewing the instructions as a whole, the court gave adequate instruction ... to ensure that the jury fully understood the issues, and to determine 'whether the instruction is misleading or states the law incorrectly to the prejudice of the objecting party.' "[13] The choice of language of the jury instructions is within the discretion of the district court.[14]
 
 
 30
 The District Court's definition of reasonable doubt read as follows:
 
 
 31
 A reasonable doubt is a fair doubt, based upon reason and common sense. This does not mean, however, that you must be convinced of a defendant's guilt to an absolute or mathematical certainty, for there are few things in life of which we can be absolutely certain. What it means, rather, is that you must be persuaded of the defendant's guilt as you would want to be persuaded about the most important concerns in your life. A reasonable doubt, in other words, does not mean a mere possibility that the defendant may be innocent, nor does it mean a fanciful or imaginary doubt or a doubt based upon groundless conjecture. In short, a reasonable doubt does not mean a doubt for the sake of doubting. What it means, rather, is an actual doubt having some reason for its basis. However, a defendant is never to be convicted on mere suspicion or conjecture.
 
 
 32
 A reasonable doubt may arise not only from the evidence produced, but also from a lack of evidence. Since the burden is always upon the prosecution to prove the accused guilty beyond a reasonable doubt of every essential element of the crime charged, a defendant has the right to rely upon failure of the prosecution to establish such proof. A defendant may also rely upon evidence brought out on cross-examination of witnesses for the prosecution.
 
 
 33
 A reasonable doubt exists in any case when, after careful and impartial consideration of all the evidence in the case, the jurors do not feel convinced to a moral certainty that a defendant is guilty of the charge.
 
 
 34
 Mazceau objects to three phrases in this instruction. First, he contends that the phrase "you must be persuaded of the defendant's guilt as you would want to be persuaded about the most important concerns of your life" is error. This Court has not dealt with this exact language before, instead focusing on the distinction between two similar formulations. This court has disapproved of similar language, but nevertheless held that it is not reversible error.[15]
 
 
 35
 Marceau's second objection is to the phrase "actual doubt having some reason for its basis." The words "substantial doubt" had originally been included in the court's proposed instruction, but were taken out upon defense counsel's objection. Because the court took the word "substantial" out, the only issue is the use of the words "actual doubt." We do not find that the modifier "actual" is inconsistent with the meaning of "reasonable doubt."[16]
 
 
 36
 Last, Marceau objects to the phrase, "a reasonable doubt, in other words, does not mean a mere possibility that the defendant may be innocent." Mazceau's attempted to equate "mere
 
 
 37
 possibility" with "real possibility" or "real doubt" are unconvincing.
 
 
 38
 The instruction as a whole does not lessen the Government's burden suggested by the term "reasonable doubt" standing alone.[17]
 
 V. Readback of witness' testimony
 
 39
 Bostwick testified at trial that he had seen a serrated knife in Marceau's hand when Marceau got into the truck. Upon the jury's request, the district judge directed the court reporter to read back his testimony, both direct and cross-examination. Marceau objected on the grounds that Bull Shoe's testimony should be read at the same time (Bull Shoe had testified that he did not see any knife).
 
 
 40
 A district court's decision to readback testimony to the jury is reviewed for an abuse of discretion.[18] The reading back of a witness's testimony is preferred over providing the jurors with a transcript, where they are not likely to overemphasize one portion.[19]
 
 
 41
 The entire direct and cross examination were read to the jury. Bostwick's testimony did not directly contradict Bull Shoe's testimony. Marceau's counsel specifically asked that Bull Shoe's testimony also be read. The district court discussed why it felt that it was unnecessary noting that Bull Shoe had been cross examined just that morning. The district court also asked the jury whether they needed the Bull Shoe testimony read as well.
 
 VI. Polygraph evidence
 
 42
 Bostwick gave three inconsistent statements to police during the investigation of the case. On cross examination, defense counsel questioned Bostwick about the inconsistencies of his statements. On redirect, Bostwick. testified that the first two statements he gave to law enforcement were not the truth and that he had lied because he was scared and because he did not want to have any problems with the families. On recross, Bostwick stated that he was scared of the police and the FBI, even though they had not threatened him. The district court allowed the prosecution to question Bostwick on that issue. Bostwick then said that, he was scared of the FBI because he thought they were going to make him take a polygraph test, and his fear was because he had been lying in his earlier statements. Bostwick did not say that he had taken a polygraph test.
 
 
 43
 In United States v. Candoll, this Court found that the admission of testimony regarding a polygraph test did not require reversal.[20] On direct examination, a government agent stated that an individual other than the defendant had been pursued as a possible suspect, "culminat[ing] in asking him to take a polygraph examination."[21] The trial court refused to strike the reference. This Court found that the unsolicited reference probably did not affect the verdict because the jury could have inferred that the individual had been eliminated as a suspect based on other evidence in the record.[22]
 
 
 44
 Bostwick had already admitted on redirect that he lied in his first two statements. He did not claim that he ever took a polygraph test. The testimony that the prospect of a polygraph test motivated him to testify truthfully was relevant to his credibility. Even if it were inadmissible, as in Candoli the jury had basis in the rest of his testimony to determine for itself at what point he had lying.
 
 VII. Cumulative errors
 
 45
 In determining whether cumulative errors require reversal, the Court reviews all errors preserved for appeal to determine if prejudice exists.[23] We find no error, and no prejudice if any error there was.
 
 
 46
 AFFIRMED.
 
 
 
 **
 Honorable Thomas M. Reavley, Senior United States Circuit Judge for the United States Court of Appeals, Fifth Circuit, sitting by designation
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir. R. 36-3
 
 
 [1]
 United States v. Hoyos, 573 F.d 1111, 1115 (9th Cir.1978)
 
 
 [2]
 United States v. Torres, 937 F.2d 1469, 1474 (9th Cir.1991), cert. denied, 502 U.S. 1037 (1992)
 
 
 [3]
 United States v. Paguio, 114 F.3d 928, 932 (9th Cir.1997)
 
 
 [4]
 United States v. Magana-Olvera, 917 F.2d 401, 407 (9th Cir.1990)
 
 
 [5]
 United States v. Bahena-Cardenas, 70 F.3d 1071, 1072-73 (9th Cir.1995)
 
 
 [6]
 United States v. Stauffer, 922 F.2d 508, 514 (9th Cir.1990)
 
 
 [7]
 Id
 
 
 [8]
 United States v. Gomez-Osorio, 957 F.2d 636, 642 (9th Cir.1992)
 
 
 [9]
 United States v. Jackson, 726 F.2d 1466, 1468 (9th Cir.1984)
 
 
 [10]
 United States v. Zuniga, 989 F.2d 1109, 1111 (9th Cir.1993)
 
 
 [11]
 United States v. Keiser, 57 F.3d 847, 851 (9th Cir.1995)
 
 
 [12]
 United States v. Terry, 911 F.2d 272, 278 (9th Cir.1990)
 
 
 [13]
 Id. at 279 (quoting United States v. Epinosa, 87 F.2d 604, 614 (9th Cir.1987), cert denied, 485 U.S. 968 (1988))
 
 
 [14]
 United States v. Echeverry, 759 F.2d 1451, 1455 (9th Cir.1985)
 
 
 [15]
 United States v. Olano, 62 F.3d 1180, 1202 (9th Cir.1995) cert. denied, 117 S.Ct. 303 (1996); United States v. Jaramillo-Suarez, 950 F.2d 1378, 1386 (9th Cir.1991)
 
 
 [16]
 Cf. Victor v. Nebraska, 114 S.Ct. 1239, 1249 (1994) (noting a "series of decisions approving instructions cast in terms of an 'actual doubt' that would cause a reasonable person to hesitate to act")
 
 
 [17]
 United States v. Velasquez, 980 F.2d 1275, 1278 (9th Cir.1992), cert. denied, 508 U.S. 979 (1993)
 
 
 [18]
 United States v. Hernandez, 27 F.3d 1403, 1408 (9th Cir.1994), cert. denied, 115 S.Ct. 1147 (1995)
 
 
 [19]
 Id
 
 
 [20]
 United States v. Candoli, 870 F.2d 496 505 (9th Cir.1989)
 
 
 [21]
 Id. at 504
 
 
 [22]
 Id. at 505
 
 
 [23]
 United States v. Necoechea, 986 F.2d 1273, 1282 (9th Cir.1993)