UNITED STATES of America, Plaintiff–Appellee,

v.

Arturo GONZALEZ–SANDOVAL, Defendant–Appellant.

No. 89–50174.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 5, 1989.

Decided Jan. 18, 1990.

Martha M. Hall, Federal Public Defenders of San Diego, Inc., San Diego, Cal., for defendant-appellant.

Michael G. Wheat and Roger W. Haines, Jr., Asst. U.S. Attys., San Diego, Cal., for plaintiff-appellee.

Before GOODWIN, Chief Judge, SCHROEDER and O'SCANNLAIN, Circuit Judges.

GOODWIN, Chief Judge:

Arturo Gonzalez–Sandoval appeals his conviction for being found illegally in the United States after deportation, in violation of 8 U.S.C. § 1326.

He was sentenced under the Sentencing Reform Act of 1984 (SRA) to six months in prison and supervised release for one year. Prior to trial Gonzalez made three motions, all of which the court denied: (1) to suppress all statements obtained from him in violation of his *Miranda* rights; (2) to dismiss the indictment as a result of unjustifiable delay in violation of the fifth amendment's due process clause and sixth amendment right to a speedy trial; and (3) for a continuance to obtain a tape of his deportation hearing and witness testimony with which to challenge the outcome of the deportation proceeding. The court's denial of these motions, and its determination of his sentence according to the SRA, form the basis of Gonzalez's appeal.

## BACKGROUND

On April 6, 1986, Gonzalez–Sandoval was arrested and charged with transporting illegal aliens in violation of 8 U.S.C. § 1324(a)(2), aiding and abetting illegal entry in violation of 18 U.S.C. § 2 and 8 U.S.C. § 1325, and failure to carry documents in violation of 8 U.S.C. § 1304(e). At the time of the arrest, the government was unaware that Gonzalez–Sandoval, using the alias Francisco Guillen, had been deported five days earlier. As a result of evidentiary problems, all of the criminal

charges against Gonzalez–Sandoval were dismissed on April 17, 1986.

On February 1, 1987, Gonzalez–Sandoval was arrested on state burglary charges. He was convicted a month later and sentenced to two years in state prison. He served his time for the burglary and was released. On October 4, 1988, Gonzalez–Sandoval repaired to the local police station to provide the urine sample that was a condition of his parole. His parole officer asked him if he had ever been deported. Gonzalez–Sandoval replied that he had, but that everything had been settled and he was now legally in the United States. As he was leaving, another officer accused him of being a deported alien, arrested him, and called the Border Patrol Office to report his suspicions.

Agent Mario Vasquez of the U.S. Border Patrol responded to the call and interviewed Gonzalez in a Calexico Police Department holding cell. Without giving *Miranda* warnings, Agent Vasquez asked Gonzalez where he was born and whether he had documents verifying his legal entry into the United States. Vasquez then transported Gonzalez to the Calexico Border Patrol Station for further questioning and ran a series of records checks to determine his immigration status. After the first check revealed that Gonzalez was an immigrated alien, Vasquez asked if he had ever used an alias. Gonzalez answered that previously he had used the name "Guillen". Vasquez then ran a records check under that name and for the first time discovered the record of the previous deportation. Only then was Gonzalez advised of his *Miranda* rights and charged with violation of 8 U.S.C. § 1326.

## I. THE MIRANDA VIOLATION

Gonzalez–Sandoval argues that the district court erred in denying his pre-trial motion to suppress statements elicited from him by Border Patrol agents while he was being detained in the Calexico Police Station. He contends that the questions asked about his immigration status and place of birth constitute an "interrogation" in violation of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and that his answers and information obtained derivatively through them should have been excluded at trial. The government argues that the questions were aimed merely at establishing Gonzalez–Sandoval's identity and were not calculated to elicit inculpatory responses.

The ruling in *Miranda* prohibits "custodial interrogation" unless the government first gives warnings to the suspect. However, as we noted in *United States v. Booth*, 669 F.2d 1231 (9th Cir.1981), "not every question posed in a custodial setting is equivalent to 'interrogation.'" *Id.* at 1237. Custodial questioning constitutes interrogation "whenever, under all the circumstances involved in a given case, the questions are 'reasonably likely to elicit an incriminating response from the suspect.'" *Id.*, quoting *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 1690, 64 L.Ed.2d 297 (1980).

Neither party contests that Gonzalez–Sandoval was in custody when the questioning at issue occurred. Whether the inquiries made of Gonzalez–Sandoval constitute interrogation is subject to review under the "clearly erroneous" standard. *United States v. Equihua–Juarez*, 851 F.2d 1222, 1225 n. 7 (9th Cir.1988); *United States v. Poole*, 806 F.2d 853 (9th Cir.1986).

In previous cases we have held that, because the relevant questions rarely elicit an incriminating response, routine gathering of biographical data does not constitute interrogation sufficient to trigger constitutional protections. *United States v. Perez*, 776 F.2d 797, 799 (9th Cir.1985); *United States v. Mata–Abundiz*, 717 F.2d 1277, 1280 (9th Cir.1983); *Booth*, 669 F.2d at 1238. That exception is inapplicable, however, where the elicitation of information regarding immigration status is reasonably likely to inculpate the respondent. As we observed in *Mata–Abundiz*, "[t]he relationship of the question asked to the crime suspected is highly relevant." 717 F.2d at 1280. In that case the defendant had been arrested and was being held on charges of carrying a concealed weapon and posses-

sion of a firearm by an alien when an INS agent visited him in jail and questioned him about his citizenship. The INS officer was aware of the charges against the defendant and used the information he elicited to confirm Mata–Abundiz's alien status and help secure the conviction. This court reversed the conviction, finding the INS agent's questioning equivalent to an interrogation in violation of *Miranda,* because "[t]he 'background questions' asked related *directly* to an element of a crime that [the INS official] had reason to suspect." *Id.* at 1280 (emphasis added).

Similarly *Equihua–Juarez* involved the questioning of a defendant in police custody by a border patrol agent seeking to ascertain the defendant's immigration status. 851 F.2d 1222. There we found that an inquiry into biographical matters constituted interrogation because "[t]he [a]gent's questions were directed at eliciting information which could be used in a criminal investigation and potential prosecution of [the defendant] on charges of felony illegal entry." 851 F.2d at 1226.[1]

The responses elicited from Gonzalez–Sandoval by the border patrol agents were used to help prove the charges of illegal entry and being a deported alien found in the United States. Agent Vasquez had reason to suspect that Gonzalez–Sandoval was in this country illegally and the questions he posed were "reasonably likely" to elicit responses which would substantiate the charge that Gonzalez–Sandoval had violated 8 U.S.C. § 1326. In light of both the context of Vasquez's questioning and the content of the questions, it appears that Gonzalez–Sandoval was subject to interrogation and that his statements were obtained in violation of *Miranda.*[2] The trial court erred in denying Gonzalez–Sandoval's motion to suppress with regard to the statements made prior to the giving of the *Miranda* warnings.

■ The conviction will be sustained, however, if admission of the un–*Mirandized* statements constituted harmless error. *See United States v. Wilson,* 666 F.2d 1241, 1247 (9th Cir.1982). In addition to Gonzalez–Sandoval's responses to Agent Vasquez's questions about his place of birth, immigration status, and use of aliases, the prosecution also introduced the record of Gonzalez–Sandoval's prior deportation and the confession he made after having received *Miranda* warnings to secure the conviction. The deportation record and the confession constitute overwhelming evidence of Gonzalez–Sandoval's guilt under 8 U.S.C. § 1326 and, if properly admitted, would support a finding that introduction of the un–*Mirandized* statements was harmless beyond a reasonable doubt. We therefore now consider the admissibility of these two items of evidence.

### A. The Deportation Record

Gonzalez–Sandoval in essence contends that the record of his prior deportation was a "fruit" of the illegal interrogation of him by Agent Vasquez and thus should have been suppressed. The question whether non-testimonial physical evidence discovered as the result of statements obtained in violation of *Miranda* is inadmissible as "fruit of the poisonous tree" has not yet been conclusively decided.[3]

---

**1.** *See also United States v. Disla,* 805 F.2d 1340 (9th Cir.1986) (questioning a defendant as to his residence subjected him to "interrogation" for purposes of *Miranda,* where officer knew that large quantity of cocaine and cash had been found at an apartment and that residents of the apartment had not been identified and question of where the defendant lived was relevant to element of crime of possession of cocaine that the officer had reason to suspect the defendant had committed).

**2.** The government's reliance on *United States v. Rodriguez–Rodriguez,* 742 F.2d 1194 (9th Cir. 1984) is misplaced. In that very brief opinion, the court concluded without elaboration that an

inquiry into a defendant's immigration status made by border patrol agents at a railway station did not approach the level of custodial interrogation necessary before *Miranda* warnings must be given. There was no finding that the defendant was "in custody" when questioned or that the officers had any specific reason to suspect him of immigration violations prior to questioning.

**3.** As the Sixth Circuit pointed out in *United States v. Sangineto–Miranda,* 859 F.2d 1501 (6th Cir.1988), the Supreme Court has not directly addressed this issue, although it has had the opportunity to do so. *Id.* at 1516 n. 8, *citing New York v. Quarles,* 467 U.S. 649, 660 n. 9, 104

Supreme Court cases dealing with related issues, however, have enunciated certain principles to which we may look for guidance in the present case. In *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), the Court held that the mere fact that a defendant has once responded to unwarned yet non-coercive questioning does not render his subsequent confession, made after full *Miranda* warnings and a valid waiver of his rights, inadmissible as a violation of the fifth amendment. *Id.* at 318, 105 S.Ct. at 1297. The Court observed that the *Miranda* presumption of compulsion, although irrebuttable for purposes of the prosecution's case in chief, did "not require that the unwarned statements and their fruits be discarded as inherently tainted." *Id.* at 307, 105 S.Ct. at 1292. And in *Michigan v. Tucker*, the Court was asked to extend the doctrine announced in *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), applying the exclusionary rule to evidence seized in violation of the fourth amendment, to suppress the testimony of a prosecution witness whose identity was discovered as a result of information elicited from the defendant without benefit of *Miranda* warnings. *Elstad*, 470 U.S. at 308, 105 S.Ct. at 1292. It held that where there was no violation of a defendant's "core" constitutional rights, the *Wong Sun* doctrine was inapplicable. *Id.* 371 U.S. at 446, 94 S.Ct. at 2364. *See also United States v. Patterson*, 812 F.2d 1188, 1193 (9th Cir. 1987), *cert. denied*, 485 U.S. 922, 108 S.Ct. 1093, 99 L.Ed.2d 255 (1988).

▪ We find that the reasoning of *Elstad* and *Tucker* applies as well to non-testimonial physical evidence obtained as a result of a *Miranda* violation. *Cf. Patterson*, 812 F.2d at 1193 (citing *Elstad* and *Tucker*, the court held that pre-*Miranda* statements could be used in affadavit for search warrant to establish probable cause). The critical inquiry is whether the unwarned statements preceding a subsequent, warned confession or discovery of derivative evidence are made voluntarily. Where there is no evidence of coercion or a denial of due process in elicitation of the statements, the object of the fifth amendment exclusionary rule—assuring trustworthiness of evidence introduced at trial— is not served by barring admission of the derivatively obtained evidence or statements. *See Sangineto–Miranda*, 859 F.2d at 1518, *citing United States v. Washington*, 431 U.S. 181, 187–88, 97 S.Ct. 1814, 1818–19, 52 L.Ed.2d 238 (1977).

▪ Gonzalez–Sandoval contends that the circumstances surrounding the initial statements he made to Agent Vasquez indicate that they were given involuntarily. He claims that the government's failure to prosecute him for illegal entry in 1986 and its dismissal of the related charges "lulled him into believing that the government could not and would not use his statements against him in a criminal prosecution." We review a district court's finding that statements offered in evidence were made voluntarily *de novo*. *United States v. Wilson*, 838 F.2d 1081, 1086 (9th Cir.1988).

▪ Gonzalez–Sandoval's mistaken impression about the government's authority to use his statements against him does not render his admissions involuntary. "Coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the due process clause." *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986); *United States v. Eide*, 875 F.2d 1429, 1434 (9th Cir.1989). There is no evidence that the actions of any of the border patrol agents or policemen who dealt with Gonzalez–Sandoval were coercive. The record of Gonzalez–Sandoval's prior deportation was obtained as a result of police interrogation which trangressed the strictures of *Miranda*, but did not violate Gonzalez–Sandoval's fifth amendment rights. Accordingly, we find no error in the admission of the deportation record at trial.

S.Ct. 2626, 2633 n. 9, 81 L.Ed.2d 550 (1984); *Michigan v. Tucker*, 417 U.S. 433, 447, 94 S.Ct. 2357, 2365, 41 L.Ed.2d 182 (1974). *See also United States v. Scalf*, 708 F.2d 1540, 1545 (10th Cir.1983) (whether the poisonous tree doctrine applies to physical evidence obtained in consequence of a voluntary confession elicited in violation of the prophylactic rules of *Miranda* remains an open question).

## B. *The Confession*

■ As soon as Agent Vasquez discovered the fact of Gonzalez–Sandoval's prior deportation, he advised Gonzalez–Sandoval of his *Miranda* rights. Afterwards, in a sworn statement, Gonzalez–Sandoval admitted having been deported on April 4, 1986, and having used the alias Francisco Guillen–Venegas.

The admissibility of this confession is governed by the Supreme Court's decision in *Elstad*. As we stated in *United States v. Wauneka*, 770 F.2d 1434 (9th Cir.1985), the analysis of the *Elstad* decision requires as a first step that the court "determine whether the statement made by a defendant before the *Miranda* warning was actually coerced in violation of the fifth amendment." *Id.* at 1440. As we noted in the preceding section, Gonzalez–Sandoval's initial statements to Agent Vasquez, though un-*Mirandized*, were not involuntary.

If it finds that the statement was voluntary, despite having been obtained in technical violation of *Miranda*, the court then "should suppress the statement given after the *Miranda* warning only if it finds that the subsequent statement was not voluntarily made." *Id.* The determination of voluntariness "must turn on an evaluation of the surrounding circumstances and the entire course of police conduct." *Medeiros v. Shimoda*, 889 F.2d 819, 824 (9th Cir. 1989).

The record contains no evidence that Gonzalez–Sandoval was coerced into confessing after he received the *Miranda* warnings from Agent Vasquez. There is also no indication that the agents used the fact of the pre-*Miranda* statements to extract Gonzalez–Sandoval's confession or otherwise pressured him to admit his guilt. *See United States v. Wauneka*, 842 F.2d 1083, 1087 (9th Cir.1988). We therefore find no error in the admission of Gonzalez–Sandoval's confession at trial.

Because the record of Gonzalez–Sandoval's prior deportation coupled with his confession constitute overwhelming evidence of his violation of 8 U.S.C. § 1326, we conclude that the district court's admission

of Gonzalez–Sandoval's un-*Mirandized* statements was harmless error.

## II. SPEEDY TRIAL, PRE–INDICTMENT DELAY CLAIMS

Gonzalez–Sandoval contends that the post-arrest and pre-indictment delay occasioned by government actions in this case violated his fifth amendment rights under the Due Process Clause and his sixth amendment right to a speedy trial. He argues that his conviction therefore should be reversed and the case remanded to the district court with instructions to dismiss under Fed.R.Crim.P. 48(b).

### A. *Speedy Trial Act*

■ The Speedy Trial Act requires that the period between the date of an arrest and the return of an indictment not exceed thirty days. 18 U.S.C. § 3161(b). The sanction for non-compliance with this requirement is set out in section § 3162(a)(1): The charge against the individual contained in the original complaint "shall be dismissed or otherwise dropped." Gonzalez–Sandoval argues that because more than two years passed between his arrest in 1986 and the return of the indictment upon which this conviction is based, he is entitled under § 3162(a) to have the charges against him dismissed. We review violations of the Speedy Trial Act *de novo*. *United States v. Sears, Roebuck and Co.*, 877 F.2d 734, 737 (9th Cir.1989).

In *United States v. Candelaria*, 704 F.2d 1129 (9th Cir.1983), we held that § 3162(a)(1)'s dismissal sanction was not available to persons who have been arrested and then subsequently indicted for offenses with which they were not formally charged when arrested. *Id.* at 1131. Extension of the sanction to the broader class of all arrested persons, including those neither charged nor otherwise subject to some continuing restraint, was deemed contrary to the congressional intent in drafting the statute. *Id.*

■ When Gonzalez–Sandoval was arrested by border patrol agents on April 6, 1986, the complaint filed charged him with

## 1050

transporting illegal aliens in violation of 8 U.S.C. § 1324(a)(2); illegal entry in violation of 8 U.S.C. § 1325; and failure to carry documents in violation of 8 U.S.C. § 1304(e). On April 17, 1986, all criminal charges against Gonzalez–Sandoval were dismissed and he was released. In this case Gonzalez–Sandoval was arrested on October 3, 1988, once the government learned of his previous deportation. He was indicted on October 7, 1988, and charged with violating 8 U.S.C. § 1326.

Gonzalez–Sandoval contends that since the 1988 indictment is based on his illegal entry in April 1986, the thirty-day period provided for in the Speedy Trial Act clearly was exceeded. Under his view the government had to have indicted him in 1986 for all charges possibly connected with the 1986 arrest—its failure to do so bars any subsequent charges based on the incident. But at the time of the 1986 arrest, the government was unaware of his status as a previously deported illegal alien—it believed Gonzalez–Sandoval's statements at the time that he was a "lawfully admitted permanent resident"—and in fact charged him with failure to carry the required documentation of that fact under 8 U.S.C. § 1304(e).

Gonzalez–Sandoval thus does not appear to fall within the category of individuals formally charged or subject to some continuing restraint to which Congress intended the STA's provisions to apply. We agree with the finding of the district court that there has been "no showing whatsoever of a speedy trial violation."

### B. Sixth Amendment Speedy Trial Clause

■ Gonzalez–Sandoval also claims that the two-year delay between his 1986 arrest and the 1988 indictment violated his right to a speedy trial under the sixth amendment. However, the Supreme Court has emphasized that "no Sixth Amendment right to a speedy trial arises until charges are pending." *United States v. MacDonald,* 456 U.S. 1, 7, 102 S.Ct. 1497, 1501, 71 L.Ed.2d 696 (1981). *See also United States v. Marion,* 404 U.S. 307, 313, 92 S.Ct. 455, 459, 30 L.Ed.2d 468 (1971). We review violations of the sixth amendment right to a speedy trial *de novo. Sears,* 877 F.2d at 739.

■ Formal charges against Gonzalez–Sandoval were pending as of October 7, 1988, four days after the government discovered the fact of his prior deportation. No sixth amendment issue is raised by the length of this delay. Moreover, it appears that any delay in the filing of the instant charges was occasioned primarily by Gonzalez–Sandoval's own evasive efforts vis-a-vis the border patrol agents.

### C. Fifth Amendment Due Process Claim

Finally, Gonzalez–Sandoval argues that the two-year delay prior to his indictment in 1988 prejudiced him to such a degree that it constitutes a violation of his due process rights under the fifth amendment.

■■ We review claims of due process violations caused by pre-indictment delay under the abuse-of-discretion standard. *United States v. Sherlock,* 865 F.2d 1069, 1073 (9th Cir.1989). Pursuant to the Supreme Court decision in *United States v. Lovasco,* 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1971), this court utilizes a two-pronged test to determine whether a pre-indictment delay has risen to the level of a denial of due process. *United States v. Moran,* 759 F.2d 777, 780 (9th Cir.1985), *cert. denied,* 474 U.S. 1102, 106 S.Ct. 885, 88 L.Ed.2d 920 (1986). Under the first prong, the defendant has the burden of proving that "actual prejudice" occurred from the delay. *Id.* If "actual prejudice" is established, the court then weighs the length of the pre-indictment delay against the reason for the delay. *Id.*

The defendant's burden is a heavy one: "the proof must be definite and not speculative, and the defendant must demonstrate how the loss of a witness and/or evidence is prejudicial to his case." *Id.* at 782; *United States v. Mays,* 549 F.2d 670, 677 (9th Cir.1977). The weight of this burden reflects the conviction that "statutes of limitation [and not the fifth amendment

due process clause], which provide predictable, legislatively enacted limits on prosecutorial delay, provide 'the primary guarantee against bringing overly stale charges.'" *Marion,* 404 U.S. at 322, 92 S.Ct. at 464, *quoting United States v. Ewell,* 383 U.S. 116, 122, 86 S.Ct. 773, 777, 15 L.Ed.2d 627 (1966).

█ Gonzalez–Sandoval claims that he has been prejudiced because witnesses to the April 1986 incident have been deported and therefore are unavailable. He maintains that the 1986 arrest was illegal and that, had he been prosecuted in 1986 for illegal entry, he would have been able to suppress all evidence on the basis of the illegal arrest. This claim is wholly speculative: No proffer was made of how the missing testimony would support Gonzalez–Sandoval's claims and no other evidence suggests that the 1986 arrest was illegal. Gonzalez–Sandoval also claims that if he had been indicted, tried, and convicted in 1986, he would have received sentencing concurrent with his state sentence, resulting in a shorter total period of incarceration. This claim too is entirely speculative. Previous decisions by this court have applied the actual prejudice test stringently. *See United States v. Horowitz,* 756 F.2d 1400, 1405 (9th Cir.), *cert. denied,* 474 U.S. 822, 106 S.Ct. 74, 88 L.Ed.2d 60 (1985); *United States v. Kidd,* 734 F.2d 409, 413 (9th Cir.1984); *United States v. Mills,* 641 F.2d 785, 788 (9th Cir.), *cert. denied,* 454 U.S. 902, 102 S.Ct. 409, 70 L.Ed.2d 221 (1981). Because we find that Gonzalez–Sandoval's assertions fail to establish actual prejudice from the delay, we do not reach the second prong of the due process test.

## III. DENIAL OF MOTION FOR CONTINUANCE

█ Gonzalez–Sandoval claims that the district court abused its discretion in deny-

ing his motion for a continuance to enable him to obtain witness testimony for a collateral attack on his deportation proceeding. This court reviews a district court's decision to grant or deny a continuance for abuse of discretion. *United States v. Studley,* 783 F.2d 934 (9th Cir.1986).[4]

█ In *United States v. Mendoza–Lopez,* 481 U.S. 828, 107 S.Ct. 2148, 95 L.Ed.2d 772 (1987), the Supreme Court held that under the due process clause of the fifth amendment, "a collateral challenge to the use of a deportation proceeding as an element of a criminal offense must be permitted where the deportation proceeding effectively eliminates the right of the alien to obtain judicial review." *Id.* at 839, 107 S.Ct. at 2155. Gonzalez–Sandoval claims that the district court's denial of his continuance request effectively prevented him from exercising his right to challenge his deportation proceeding collaterally because he had not enough time to call "critical witnesses" or to locate the tape or transcript of the deportation hearing.

This court has stated that before a district court's denial of a continuance will be reversed, "the appellant must establish that the refusal resulted in prejudice to his defense." *United States v. Long,* 706 F.2d 1044, 1053 (9th Cir.1983). Gonzalez–Sandoval's burden again is a heavy one: "When a continuance is requested to obtain witnesses, the accused must show who they are, what their testimony will be, that the testimony will be competent and relevant, that the witnesses can probably be obtained if the continuance is granted, and that due diligence has been used to obtain their attendance on the day set for trial." *United States v. Sterling,* 742 F.2d 521, 527 (9th Cir.1984), *cert. denied,* 471 U.S. 1099, 105 S.Ct. 2322, 85 L.Ed.2d 840 (1985).

4. In *Studley* the court noted that when the sixth amendment right to counsel is implicated, traditional abuse-of-discretion review is inadequate: Instead it must conduct a more elaborate balancing analysis to determine if the denial was "fair and reasonable." *Id.* at 938, *quoting United States v. Leavitt,* 608 F.2d 1290, 1293 (9th Cir. 1979) (per curiam). Gonzalez–Sandoval claims

that because a denial of a "constitutional right" of his is involved here—i.e., the right to attack his deportation hearing collaterally—the *Leavitt* balancing analysis should be undertaken by the panel in this case. This court so far has declined to apply the *Leavitt* rule outside the right-to-counsel context and we reject the invitation to do so here.

During discovery Gonzalez–Sandoval requested his immigration "A" file, apparently in the hope that it would contain the tape or transcript of his deportation hearing or proof that the government had knowledge of his prior deportation. For some reason there was a delay in locating the file and it was not made available to Gonzalez–Sandoval until the day before trial. The file did not contain a record of the deportation proceeding and Gonzalez–Sandoval offers no explanation for his belief that it would; he made no other requests for the tape or transcript of the hearing and never informed the government that he intended to challenge the hearing collaterally. Nor did the file contain evidence of government knowledge of his prior deportation.

Gonzalez–Sandoval has made no showing of how the denial of additional time to study the file prejudiced his defense. He also has failed to fulfill the requirements set forth in *Sterling* that he establish the substance of the witness testimony he would have obtained with more time and the fact that the witnesses could be procured if the continuance was granted. Gonzalez–Sandoval admitted that he was unsure of the whereabouts of the witnesses he sought and said he thought they might be able to testify about the April 6th arrest. But he was deported *prior* to the April 6 arrest and, under 8 U.S.C. § 1326, the government only had to prove that Gonzalez–Sandoval subsequently was found in the United States. Gonzalez–Sandoval makes no claim that his witnesses would be able to establish that he was not in the United States after having been deported.

*Mendoza–Lopez* held that defendants have the right to attack their deportation proceedings collaterally. 481 U.S. at 839, 107 S.Ct. at 2155. No entitlement to automatic grants of continuance requests is implied in this right. We find no abuse of discretion in the district court's denial of Gonzalez–Sandoval's request for a continuance.

## IV. SENTENCING CHALLENGE

Lastly Gonzalez–Sandoval argues that because his crime was committed during the period of time after this court had declared the Sentencing Reform Act of 1984 (SRA) unconstitutional and before the Supreme Court's reversal of that decision, use of the Sentencing Guidelines by the district court was a violation of the ex post facto clause as incorporated into the due process clause of the fifth amendment. *See Marks v. United States*, 430 U.S. 188, 191–92, 97 S.Ct. 990, 992–93, 51 L.Ed.2d 260 (1977). The government contends that, under the analysis traditionally employed to determine whether a judicial decision should be applied retroactively and this court's decision in *United States v. Kane*, 876 F.2d 734 (9th Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 173, 107 L.Ed.2d 130 (1989), the sentence imposed by the district court was appropriate and should be upheld.

Although not constitutionally mandated, "retroactive application of judicial decisions is the rule and not the exception." *Kane*, 876 F.2d at 735–36; *United States v. Givens*, 767 F.2d 574, 578 (9th Cir.), *cert. denied*, 474 U.S. 953, 106 S.Ct. 321, 88 L.Ed.2d 304 (1985). The SRA went into effect on November 11, 1987. The Ninth Circuit declared the Guidelines unconstitutional on August 23, 1988. *Gubiensio–Ortiz v. Kanahele*, 857 F.2d 1245 (9th Cir. 1988). On January 18, 1989, the Supreme Court effectively overruled the decision in *Gubiensio–Ortiz*, by declaring the Guidelines constitutional. *Mistretta v. United States*, 488 U.S. 361, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989). *See United States v. Bazemore*, 869 F.2d 520, 521 (9th Cir.1989). Gonzalez–Sandoval contends that because his crime was committed between August 23, 1988, and January 18, 1989, the addition under the Guidelines of one year of supervised release to the term of six months he had already served violates his rights under the due process clause of the fifth amendment.

This court considers three factors in determining whether an exception should be made to the general rule that judicial decisions are applied retroactively: "(1) whether the decision establishes a new

principle of law, (2) whether retroactive application will further or retard the purposes of the rule in question, and (3) whether applying the new decision will produce substantially inequitable results." *Kane,* 876 F.2d at 736, *quoting Barina v. Gulf Trading and Transp. Co.,* 726 F.2d 560, 563 (9th Cir.1984). In *Kane* this court decided that "[e]ach of these factors weighs in favor of applying *Mistretta* retroactively." *Id.* There the defendant had plead guilty before *Gubiensio–Ortiz* was decided. By the time of sentencing, however, the *Gubiensio–Ortiz* decision had been handed down. The government appealed the court's imposition of a non-Guideline sentence and this court reversed and remanded for sentencing under the Guidelines.

With regard to the first factor, the court found that *Mistretta'*s holding "lacks the usual earmarks that accompany a new rule of law." *Id.* It noted that when *Gubiensio–Ortiz* was decided "the Guidelines were part of a properly enacted statutory scheme of which all defendants in this circuit had notice. Those defendants were also on notice that the Supreme Court had already granted certiorari in *Mistretta* and might overrule the holding of *Gubiensio–Ortiz." Id.* The same analysis applies here. Although Gonzalez–Sandoval committed his crime after the decision in *Gubiensio–Ortiz,* he was on notice that the Guidelines were in effect and that the Supreme Court might vacate the Ninth Circuit decision.

The court in *Kane* also found, and Gonzalez–Sandoval here concedes, that retroactive application of *Mistretta* would further the goal of the SRA to stabilize sentencing in federal courts. *Id.* As for the third factor, the notice effected by the certification of *Mistretta* before the *Gubiensio–Ortiz* decision, coupled with the fact that under the Guidelines Gonzalez–Sandoval was credited with time served and received only an additional year of supervised release, combine to compel the conclusion that ret-

roactive application of *Mistretta* has not produced a substantially inequitable result. *See Kane,* 876 F.2d at 736. In addition, as the court noted in *Kane,* "recent authority in this circuit has already applied *Mistretta* retroactively and implicitly recognized that the SRA authorizes government appeals from sentences imposed while *Gubiensio–Ortiz* was the law of this circuit." *Id., citing Bazemore,* 869 F.2d 520.

 In light of the foregoing analysis and the recent Supreme Court decision vacating the decision in *Gubiensio–Ortiz* [5] we hold that the Guidelines remained a legally enacted statutory sentencing scheme throughout the five-month period between August 23, 1988, and January 18, 1989. We therefore find no due process violation in the district court's adherence to the Guidelines in determining Gonzalez–Sandoval's sentence.

The decision of the district court is AFFIRMED.

---

5. *United States v. Chavez–Sanchez,* —— U.S. ——, 109 S.Ct. 859, 102 L.Ed.2d 984 (1989).

