**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellant*,

v.

ALFONZO WILLIAMS, AKA Fonz,
AKA Relly; ANTONIO GILTON,
AKA TG, AKA Tone; BARRY
GILTON, AKA Prell; LUPE
MERCADO; ADRIAN GORDON,
AKA Tit; REGINALD ELMORE,
AKA Fat Reg; CHARLES HEARD,
AKA Cheese; ESAU FERDINAND,
AKA Sauce; PAUL ROBESON,
AKA P World; MONZELL
HARDING, JR.; JAQUAIN YOUNG,
AKA Loc,
*Defendants-Appellees*.

No. 15-10475

D.C. No.
3:13-cr-00764-
WHO-1

OPINION

Appeal from the United States District Court
for the Northern District of California
William Horsley Orrick III, District Judge, Presiding

Argued and Submitted March 16, 2016
San Francisco, California

Filed December 5, 2016

Before: Andrew J. Kleinfeld, Johnnie B. Rawlinson,
and Andrew D. Hurwitz, Circuit Judges.

Opinion by Judge Hurwitz;
Dissent by Judge Kleinfeld

## SUMMARY[*]

### Criminal Law

Affirming the district court's suppression order, the panel held that when a defendant charged with murder invokes his *Miranda* rights, the government may not admit in its case-in-chief evidence of the defendant's unadmonished responses to prison officials' questions about his gang affiliation.

Dissenting, Judge Kleinfeld wrote that the "public safety" and "booking" exceptions to *Miranda* make the defendant's answer to a gang question admissible.

### COUNSEL

Ann M. Voigts (argued), Assistant United States Attorney; Barbara J. Valliere, Chief, Appellate Division; Brian J. Stretch, United States Attorney; United States Attorney's Office, San Francisco, California; for Plaintiff-Appellant.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Mark Stuart Goldrosen (argued), San Francisco, California, for Defendants-Appellees.

## OPINION

HURWITZ, Circuit Judge:

Antonio Gilton was arrested for murder and promptly invoked his right to an attorney. Hours later, after Gilton was taken from police headquarters to a jail, a sheriff's deputy asked him whether he was a member of a criminal gang. The government seeks to introduce Gilton's responses to that questioning in its case-in-chief to establish membership in an "enterprise," an element of the RICO offense for which he is charged. 18 U.S.C. § 1962(c), (d). The district court suppressed Gilton's statements under the rule of *Miranda v. Arizona*, 384 U.S. 436 (1966). We affirm.

## I.

On the afternoon of July 4, 2012, San Francisco police officers arrested Gilton for the murder of Calvin Sneed. Officers first took Gilton to a local police station; he was transported that evening to an interrogation room at the San Francisco Hall of Justice. At the Hall of Justice, a homicide inspector advised Gilton of his *Miranda* rights and attempted to interrogate him; Gilton unequivocally invoked his right to an attorney.

Gilton then was taken to county jail and placed in a holding cell. Around 2:30 a.m. on July 5, a deputy sheriff removed Gilton from the cell and asked whether he was a gang member. The deputy did not advise Gilton that he was

free to return to his cell without answering or to have a lawyer present; nor was Gilton informed that his answers could be used to incriminate him. In response to the deputy's inquiry whether he was affiliated with the Fillmore/Central Divisadero Playas ("CDP") gang, Gilton said, "Yeah, I hang out there, put me where I'm from."

Gilton's answers were entered by the deputy on two forms used by jail officials in determining where to house inmates—an "Information Report," which designates any gang affiliation, and a "Class Interview," which reflects whether the prisoner presents any "High Risks," including being a gang member. The deputy designated Gilton a gang member on the Information Report, and checked off "Gang Member" on a list of "High Risks" on the Class Interview. Absent a direct admission of gang affiliation, a prisoner can still be designated a gang member on the forms if two other criteria are met—including a gang-related tattoo, a prior gang-related arrest, frequent association with validated gang members, or police intelligence that he is a gang member. In classifying Gilton, the deputy relied not only on his responses to questioning, but also on his arrest record and police intelligence.

Gilton was initially charged in state court with murder, conspiracy to commit murder, discharge of a firearm at an occupied motor vehicle, and possession of a firearm by a felon. In November 2013, he was indicted by a federal grand jury and the state charges were dismissed. A superseding indictment charged Gilton with conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d), murder in aid of racketeering for the murder of Calvin Sneed, 18 U.S.C. § 1959(a)(1), and related firearms offenses. An element of the RICO count is

Gilton's membership in a RICO enterprise—here, the CDP gang. *See* 18 U.S.C. § 1962(c), (d).

Gilton moved to suppress the statements made to the deputy about gang affiliation. The district court granted the motion, holding that because "asking about Gilton's gang affiliation was reasonably likely to elicit incriminating information," the so-called "booking exception" to *Miranda* did not apply. This timely appeal followed.[1] *See* 18 U.S.C. § 3731 (allowing appeal of order granting motion to suppress).

**II.**

Under the iconic rule of *Miranda v. Arizona*, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. 436, 444 (1966). "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.* Once the defendant "indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning." *Id.* at 444–45. "[U]nless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him." *Id.* at 479.

---

[1] The district court also suppressed photographs seized from Gilton's home. The government does not challenge that ruling on appeal.

"[T]he term 'interrogation' under *Miranda* refers . . . to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).   The so-called "booking questions exception" exempts "from *Miranda*'s coverage questions to secure the biographical data necessary to complete booking or pretrial services." *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990) (plurality opinion) (quotation marks omitted) (concluding that the answers to questions regarding the defendant's name, address, height, weight, eye color, date of birth, and current age were admissible in the absence of *Miranda* warnings); *see id.* at 608 (assuming the existence of a "routine booking question" exception but finding it "unnecessary to determine whether the questions fall within" it) (Rehnquist, J., concurring).   Because such questions "rarely elicit an incriminating response, routine gathering of biographical data does not constitute interrogation sufficient to trigger constitutional protections." *United States v. Gonzalez-Sandoval*, 894 F.2d 1043, 1046 (9th Cir. 1990).

The booking questions exception, however, is subject to an important qualification:  "When a police officer has reason to know that a suspect's answer may incriminate him, however, even routine questioning may amount to interrogation." *United States v. Henley*, 984 F.2d 1040, 1042 (9th Cir. 1993).   Thus, we have consistently emphasized, consistent with *Innis*, that "the ultimate test for whether questioning constitutes interrogation is whether, in light of all the circumstances, the police should have known that a question was reasonably likely to elicit an incriminating response." *United States v. Booth*, 669 F.2d 1231, 1238 (9th Cir. 1981); *see United States v. Washington*, 462 F.3d 1124,

1132–33 (9th Cir. 2006) (applying *Booth*).  Thus, for example, when there is reason to suspect that a defendant is in the country illegally, questions regarding citizenship do not fall under the booking exception—even if they are biographical—because a response is reasonably likely to be incriminating.  *See Gonzalez-Sandoval*, 894 F.2d at 1047; *United States v. Mata-Abundiz*, 717 F.2d 1277, 1280 (9th Cir. 1983); *see also Henley*, 984 F.2d at 1042 ("[W]hile there is usually nothing objectionable about asking a detainee his place of birth, the same question assumes a completely different character when an INS agent asks it of a person he suspects is an illegal alien.").

The government insists that the deputy who asked about Gilton's gang affiliation could not have known that a response was reasonably likely to be incriminating, because no gang-related charges were then pending.  But, "[t]he test is an objective one; the subjective intent of the police is relevant, but not conclusive." *Washington*, 462 F.3d at 1132. The absence of specific gang-related charges does not mean that questions regarding the gang affiliation of a defendant arrested for a violent crime are not likely to prove incriminating.  As a unanimous California Supreme Court recently noted, gang membership exposes a defendant to "a comprehensive scheme of penal statutes aimed at eradicating criminal activity by street gangs."  *People v. Elizalde*, 61 Cal. 4th 523, 538 (2015).

> The California Street Terrorism Enforcement and Prevention Act created a substantive offense, section 186.22(a), which punishes as a misdemeanor or felony "any person who actively participates in any criminal street gang with knowledge that its members engage

in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang." Subdivision (b)(1) of that section imposes greater punishment when a felony is committed "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." The additional punishment can be substantial.

Section 12022.53 provides enhancements for *personal* use or discharge of a firearm. Its provisions apply to *any principal* when the offense is committed to benefit a criminal street gang.

Finally, in 2000 the voters passed Proposition 21, which added intentional gang-related murders to the list of special circumstances authorizing penalties of death or life without the possibility of parole. It also created the crime of conspiracy to commit a felony by active street gang participants.

*Id.* at 538–39 (alterations, citations, and quotation marks omitted).

Gang membership may also expose a defendant to federal criminal liability. For example, a defendant's sentence for a federal drug crime or crime of violence is increased by ten years if he "participates in a criminal street gang with

knowledge that its members engage in or have engaged in a continuing series of" violent or drug offenses or "intends to promote or further the felonious activities of the criminal street gang." 18 U.S.C. § 521(d)(1), (2). The federal sentencing guidelines note that "an upward departure may be warranted" "[i]f the defendant is subject to an enhanced sentence" under § 521. U.S. Sentencing Guideline Manual § 5K2.18 (U.S. Sentencing Comm'n 2015). And—as here—gang membership can give rise to RICO charges when the gang is alleged to be an "enterprise." *See* 18 U.S.C. §§ 1961(4), 1962.

The risk that information about gang affiliation will prove incriminating is even greater when a defendant is charged in California with murder, a crime that the state's Supreme Court has acknowledged is "frequently committed for the benefit of criminal street gangs." *Elizalde*, 61 Cal. 4th at 540. When the deputy asked Gilton about his gang membership, he had already been arrested on charges of murder, conspiracy to commit murder, discharge of a firearm at an occupied motor vehicle, and possession of a firearm by a felon. Questions about Gilton's gang affiliation were thus reasonably likely to elicit an incriminating response, even if the federal RICO charges had not yet been filed. *See People v. Elizalde*, 222 Cal. App. 4th 351, 372–73 (Ct. App. 2013) (holding statements regarding gang affiliation inadmissible when officer who asked defendant about his gang affiliation for housing purposes was "aware that [the defendant] had been charged with murder" but not that it was gang-related), *aff'd*, 61 Cal. 4th 523 (Cal. 2015).

The government's assertion that such questions are posed routinely,[2] and that the deputy asked the questions for a non-investigatory purpose, does not alter our conclusion. "The test is an objective one, however, and thus the subjective intent of the police, while relevant, is not conclusive." *Booth*, 669 F.2d at 1238. And, the objective inquiry is simple: Under the circumstances, are questions about gang affiliation reasonably likely to produce an incriminating response? In a case involving Medicare fraud, they are not. But when murder is the charge, the questions—even if asked for administrative purposes—are reasonably likely to elicit incriminating information.

The government argues that this case is controlled by *Washington*, in which we held that an officer's question about a defendant's gang nickname was "routine gathering of background information" that did not rise to the level of interrogation. 462 F.3d at 1133. The defendant in *Washington* argued that his response was likely to be incriminating because it might be used to identify him as having committed the charged robbery. We rejected that argument because, taken "to its logical conclusion, any time an informant uses a particular name to identify the person who committed a crime, it would be impermissible interrogation for the police to ask the suspect his name because confirming his identity would be 'incriminating.'" *Id.* We noted that in most cases "simply asking for a suspect's name" or its equivalent is not likely to produce an incriminating response, and even if identification "may help

---

[2] The record contains no evidence about how frequently the gang questions are asked, or how the decision is made whether to make the inquiry in a particular case.

lead to the prosecution of that person for a crime," a person's identity alone is not protected by the Fifth Amendment. *Id.*

But this is far different case. As discussed above, a defendant charged with a violent crime in California who is a gang member is subject to far greater jeopardy than those who are not gang members. And, the same is true under federal law. Seeking information about gang membership is thus far more likely to produce an incriminating response than inquiring about a defendant's nickname.

The government also attempts to invoke the "public safety exception" to *Miranda* articulated in *New York v. Quarles*, 467 U.S. 649 (1984). In *Quarles*, a rape victim approached police officers, described her assailant, stated that he was armed with a gun, and said that he had just entered a grocery store. *Id.* at 651–52. An officer approached the suspect in the store, frisked him, and found that "he was wearing a shoulder holster which was then empty." *Id.* at 652. The officer asked him where the gun was, the suspect responded; the officer immediately retrieved the loaded gun, placed the suspect under arrest and read him his *Miranda* rights. *Id.*

The Court held that "on these facts there is a 'public safety' exception to the requirement that *Miranda* warnings be given." *Id.* at 655. The police "in the very act of apprehending a suspect, were confronted with the immediate necessity of ascertaining the whereabouts of a gun which they had every reason to believe the suspect had just removed from his empty holster and discarded in the supermarket." *Id.* at 657. The Court concluded that in such a "kaleidoscopic situation . . . where spontaneity rather than adherence to a police manual is necessarily the order of the day," officers should not be placed "in the untenable position of having to

consider, often in a matter of seconds, whether it best serves society for them to ask the necessary questions without the Miranda warnings and render whatever probative evidence they uncover inadmissible, or for them to give the warnings in order to preserve the admissibility of evidence they might uncover but possibly damage or destroy their ability to obtain that evidence and neutralize the volatile situation confronting them." *Id.* at 656, 657–58.

"In determining whether the public safety exception to *Miranda* applies, we ask whether there was an objectively reasonable need to protect the police or the public from any immediate danger." *United States v. Carrillo*, 16 F.3d 1046, 1049 (9th Cir. 1994) (quotation marks omitted) (holding that asking a defendant whether he had any drugs or needles on his person—prior to a body search—fell within the exception as it "stemmed from an objectively reasonable need to protect [the officer] from immediate danger"); *see also United States v. Brady*, 819 F.2d 884, 887–88 (9th Cir. 1987) (applying public safety exception to a question whether defendant had a gun in his car because the officer "had to control a dangerous situation" in which a crowd had gathered and the defendant's car "stood with its door open and the keys in the ignition"). There was no such danger here. The deputy retrieved Gilton from a locked holding cell around 2:30 a.m.—hours after Gilton arrived at the jail. There was no "kaleidoscopic situation," nor was the deputy put to the Hobson's choice of deciding within seconds whether society was best served by asking the questions without a *Miranda* warning or giving such a warning and damaging his ability to neutralize a "volatile situation." *Quarles*, 467 U.S. at 656, 658. That the questions may have been asked in the general interests of inmate safety does not mean that there was an urgent need to protect either the deputy or others against

immediate danger; the narrow "public safety exception" therefore does not apply.

## III.

For the reasons above, we affirm the district court's suppression order. But, it is also important to note what we do not hold. We do not hold that prison officials may not inquire into a prisoner's gang membership in the interests of inmate safety. *See, e.g.*, *Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 132 S. Ct. 1510, 1518 (2012) ("Gang rivalries spawn a climate of tension, violence, and coercion.") (quotation marks omitted). Nor do we hold that the responses to such questions cannot be used for purposes of inmate housing. Rather, we hold only that when a defendant charged with murder invokes his *Miranda* rights, the government may not in its case-in-chief admit evidence of the prisoner's unadmonished responses to questions about his gang affiliation.[3]

**AFFIRMED.**

---

KLEINFELD, Senior Circuit Judge, dissenting:

I respectfully dissent. The district court's suppression order should be reversed, and the statements admitted. Two

---

[3] The government does not suggest that the deputy was otherwise unable to secure information needed to house Gilton safely. Indeed, even had Gilton refused to answer the questions, he apparently would nonetheless have been classified as a member of CDP on the basis of his arrest record and officer intelligence.

exceptions to *Miranda*, the "public safety exception" and the "booking exception," apply. These exceptions make Gilton's answer to the gang question admissible against him in his criminal trial.

Here is the classification form as filled in for Antonio Gilton, the codefendant at issue:

---

**SAN FRANCISCO SHERIFF'S DEPARTMENT CLASSIFICATION UNIT**
**SECURITY THREAT GROUP / INFORMATION REPORT**

LAST NAME: **GILTON**     FIRST NAME: **ANTONIO**     MI:
DOB: ▮     SEX: MALE ☒ FEMALE ☐     RACE: BLACK
JAIL #: ▮     FBI #: ▮     SF#: ▮
CDC #: ▮     GANG: FILLMORE/CDP     MONIKER:
NOTES: CDP-CENTRAL DIVIS PLAYERS

1) ☒   \*SELF ADMISSION: Direct admission of gang membership.
    STATEMENT: WHEN ASKED IF GILTON IS AFFILIATED WITH FILLMORE/CDP, HE STATED, "YEAH, I HANG OUT THERE. PUT ME WHERE I'M FROM."

2) ☐   \*TATTOO'S: Individual has specific tattoo's pertaining to their gang.
    DESCRIPTION:

3) ☐   \*GANG DOCUMENTS OR PAPAPHERNALIA: Possession (immediate control, including cell locker/bin) of internal documents of a gang such as: By-laws, rosters, hit lists and similar items that only a member or associate would be allowed to posses. Paraphernalia, as defined by contraband i.e.: Graffiti, pictures, etc.
    DESCRIPTION:

4) ☐   \*PHOTOS: Individual or group photo/s showing subject with validated gang members (particularly showing hand signs, tattoo's, specific colors, weapons, cash and drugs).
    DESCRIPTION:

5) ☐   \*FREQUENT ASSOCIATION: Documented and credible sightings of the individual with validated gang members (specific housing unit, yard, gym and court room – during a gang member's trial or as a visitor of a validated gang member).
    DESCRIPTION:

6) ☐   \*CORRESPONDENCE: Subject exchanges communiqués with known gang member of County Jail, CYA or Prison. Mail/s wherein the subject identifies themselves as gang members (specific language, moniker, numbers or graffiti).
    \*Make copies of materials for the file.

7) ☒   \*PRIOR ARREST: Records showing that subject has been arrested with validated gang member/s or a conviction for 186.22 PC. Arrest but no conviction on 186.22 PC can be used for association.

8) ☒   \*FELLOW OFFICER INTELLIGENCE: Information by another law enforcement or corrections agency that the subject is a gang member.

9) ☐   \*OTHER IDENTIFICATION: Subject is identified by two (2) or more validated gang members (fellow or rival).
    LIST SUBJECTS:

\*SELF ADMISSION is valid as stand alone criteria in a custodial setting.
\*ASSOCIATION is for single criteria other than SELF ADMISSION.
\*TWO (2) OR MORE criteria are admissible for MEMBERSHIP.

    The above subject has been identified as MEMBER: ☒     ASSOCIATE: ☐ of a Criminal Street Gang (Penal Code Sec. 186.22) based on the foregoing and for the purposes of housing for the safety and security of the San Francisco Jail Facilities (Title 15 sections 1050, Penal Code sections 4001 / 4002).

DEPUTY: MARACHA     STAR#: 1901     DATE: 07/05/2012

\*ADDITIONAL NOTES:

---

It is evident from the form that Gilton was already thought to be a gang member by sheriff's department personnel, that he was asked if he was affiliated with "Fillmore/CDP," and that he answered "Yeah, I hang out there, put me where I'm from." The acronym "CDP" refers to the Central Divisadero Playas Gang. This answer was incriminating, both on the charges against Gilton for killing and conspiring to kill, and for state gang or federal RICO charges that might subsequently be filed.

Gilton's answer was obtained and also was valuable for an entirely different purpose, determining where to put him in jail and who should or should not be his roommate. He needed to be transferred from his holding cell to the jail. A "holding cell" is a temporary and often solitary and uncomfortable cell in which people are held for a few hours until they are transferred to jail. A jail is where prisoners are held before trial, if not released on bail, and on short sentences after conviction, typically for misdemeanors rather than felonies. Gilton's answer, "put me where I'm from," shows that he understood that his reply would be used as an aid in determining where in jail to put him. He chose to express a preference. His answer appears to be artfully worded; he does not say in so many words that he is a member of the gang, just that he "hang[s] out" with the people in it. Some gangs have "hangarounds," non-members who are considering and being considered for membership. Gilton's declaration in support of his motion to suppress is also artfully worded. He does not say that he would have refused to say that he hung around with the gang and wanted to be placed there, had his *Miranda* warning been repeated, or had a lawyer been provided.

Two exceptions to inadmissibility apply here, the "public safety exception" and the "routine booking question" exception.  Their purposes overlap in this case.

The "public safety exception" allows admission of a defendant's custodial statements against him in his criminal trial, despite lack of *Miranda* compliance. This exception is unaffected by whether the question is likely to elicit an incriminating response.  The Supreme Court established it in *New York v. Quarles*.[1]  Though the facts are different here, the rationale applies.   In *Quarles*, the police chased a suspected rapist, caught him, frisked him and found an empty holster, and handcuffed him.  Then, before Mirandizing him, the police asked him where the gun was.  He replied, nodding toward some empty cartons and saying "the gun is over there."[2]   It was.   He was formally placed under arrest, Mirandized, and asked if it was his gun and where he got it. He replied that it was indeed his gun, which he had purchased in Miami.  The Court held that the admission he made while cuffed but before getting his *Miranda* warning, that "the gun is over there," could not properly be suppressed, despite *Miranda*.[3]

*Quarles* held that the statement, "the gun is over there," was made while the subject was in police custody. Importantly, the officers were no longer concerned for their own physical safety.  The Court held that even though the police were not in danger, nor was the suspect still dangerous

---

[1] 467 U.S. 649 (1984).

[2] *Id.* at 652.

[3] *Id.* at 655–60.

to others, "there is a 'public safety' exception to the requirement that Miranda warnings be given."[4]  The gun was hazardous to the public if found by an accomplice, store employee, or store customer.  The Court explained this in terms of "social cost."  The rationale was that *Miranda* warnings in custodial interrogation were desirable when the social cost was merely fewer convictions, but not when there was the additional social cost such as the danger from the gun.  The Court held that "the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination."[5]  The "public safety exception" "will be circumscribed by the exigency which justifies it."[6]  Thus *Miranda* has no application where exigencies involving public safety justify the question, even though the prophylactic against compelled self incrimination is sacrificed.

Time mattered in *Quarles*, because the police wanted to find the gun before someone else did.  Time matters here too, because Gilton needed to be safely housed in jail at the time of his transfer from the holding cell.  No chase or shooting was going on in *Quarles*.  The only exigency was from the gun, because Quarles knew where he had tossed it and the police did not.  The Court's explanation, in terms of "social cost," meant that had the only burden of applying *Miranda* been suppression of the suspect's admission at trial, then *Miranda* would have applied, but the additional "social cost"

---

[4] *Id.* at 655.

[5] *Id.* at 657.

[6] *Id.* at 658.

of danger to the public made the *Miranda* prophylactic too risky.

That same "social cost" rationale applies to Gilton's request to "put me where I'm from," with the people he "hangs around" with.  People in jail are part of the "public." Some are innocent, some are nonviolent people there for nonviolent reasons like unpaid fines, and some are extremely dangerous violent criminals and gang members.  After confining them and rendering them unable to defend themselves, the state owes them a duty to protect them from each other.  "California's other prisoners may be murderers, rapists, drug dealers, and child molesters, but California is responsible for protecting even those sorts of people from murder by other prisoners.  Indeed, the Eighth Amendment requires that prison officials 'must take reasonable measures to guarantee the safety of the inmates.'"[7]  And as the Supreme Court has said, "[L]aw enforcement officers bear a responsibility for ensuring that the custody of an arrestee does not create inordinate 'risks for facility staff, for the existing detainee population, and for a new detainee.'"[8]

A second, independent exception should also be extended to this case, the "booking exception."  The plurality opinion in *Pennsylvania v. Muniz*[9] holds that routine booking

---

[7] *Griffin v. Gomez*, 741 F.3d 10, 21 (9th Cir.) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)), *cert. denied sub nom. Griffin v. Beard*, 135 S. Ct. 114 (2014).

[8] *Maryland v. King*, 133 S. Ct. 1958, 1972 (2013) (quoting *Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 132 S. Ct. 1510, 1518 (2012)).

[9] 496 U.S. 582 (1990).

questions to secure biographical data necessary to complete booking or pretrial services are exempt from the *Miranda* prohibition, so the answers need not be suppressed.[10]  The Court distinguished between questions "reasonably related to the police's administrative concerns" and questions "designed to elicit incriminatory admissions."[11]  Had the question about gang membership been asked of Gilton by someone responsible for prosecuting him, or investigating for his prosecution, it would be "designed to elicit incriminatory admissions."  But it was not.  Asked by someone responsible for assigning his housing in jail, as it was, the question was "reasonably related to the police's administrative concerns."  The administrative concern was safety for Gilton, and safety for inmates physically accessible to him, while he was in jail.

That Gilton was charged with murder made the need to ascertain gang affiliation especially important for safety.  Without the gang knowledge, he could easily have been put in danger from revenge by someone affiliated with the person he had allegedly killed.[12]   As the Court explained in *Maryland v. King*, knowing "the type of person whom they are detaining" mitigates risks to staff, inmates, and the defendant.[13]  In this case, the sheriff's department already had information about Gilton's gang status, but it could have been

---

[10] *Id.* at 600.

[11] *Id.* at 601–02 & n.14.

[12] *People v. Williams*, 294 P.3d 1005, 1018 (Cal. 2013) (victim's brother in the next room says "you're a dead man").

[13] *King*, 133 S. Ct. at 1971–72.

wrong or outdated,[14] and confirming what they thought they knew was important to his and others' safety.

It would be presumptuous of us to limit the Supreme Court decisions in *Quarles* and *Muniz* to their facts, and we have not.[15] In *United States v. Carillo* we held that under *Quarles* an officer at a detention facility could ask the in-custody suspect if he had any drugs or needles on his person without Mirandizing him.[16] The officer about to pat the inmate down needed to protect himself from the danger of getting pricked by a needle. "[A] pressing need for haste is not essential" to applicability of *Quarles*.[17] The question in *Carillo* might not necessarily have elicited an incriminating response, but it did: "no, I don't use drugs, I sell them."[18] We held not merely that the officer could ask the question and use the response to protect himself, as the majority in the case before us now would have held; we held that admission of the answer at trial did not violate *Miranda*.

Nor have we confined the "booking exception" to the facts in *Muniz*. We held that the exception applied to asking an inmate being booked what his "gang moniker" was, in

---

[14] *See Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 132 S. Ct. 1510, 1521 (2012) (citing *Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 752 (1989)).

[15] *United States v. Brady*, 819 F.2d 884, 888 (9th Cir. 1987).

[16] 16 F.3d 1046, 1049–50 (9th Cir. 1994).

[17] *Id.* at 1050.

[18] *Id.* at 1049.

*United States v. Washington*.[19]  Asking the inmate his gang moniker is similar to asking his gang affiliation, because a "gang moniker" would signify gang membership.  The question was as likely to produce an incriminating response in *Washington* as the similar question was in this case, because it would imply gang membership, and because the police had evidence that "Rock," Washington's gang moniker, was the perpetrator.[20]  We nonetheless treated this question, likely to elicit an incriminating response, as a "routine booking question" because gang information is routinely obtained "to ensure prisoner safety."[21]  We should apply *Washington* and conclude that the gang question in the case before us falls within the "booking exception," so *Miranda* does not apply.

The majority relies on four cases for its more restrictive view of the booking exception, *Booth*, *Henley*, *Mata-Abundiz*, and *Gonzalez-Sandoval*.  Not a single one of these cases involves a question during booking.  The questions were asked, respectively, on the street,[22] in the police car,[23] in a holding cell by an officer interrogating to prove a crime,[24] and

---

[19] 462 F.3d 1124, 1132–33 (9th Cir. 2006).

[20] *Id.* at 1129, 1133.

[21] *Id.* at 1133.

[22] *United States v. Booth*, 669 F.2d 1231, 1234 (9th Cir. 1981).

[23] *United States v. Henley*, 984 F.2d 1040, 1042 (9th Cir. 1993).

[24] *United States v. Gonzalez-Sandoval*, 894 F.2d 1043, 1046–47 (9th Cir. 1990).

in prison ten days after booking had occurred.[25]  None of these cases is in point.

There is an "objectively reasonable need" to ask about gang affiliation.[26]  As the Supreme Court stated, "Jails and prisons . . . face grave threats posed by the increasing number of gang members who go through the intake process."[27] High-ranking gang members are often incarcerated, and direct the gang's activities both within and without.[28]  There is a high likelihood of violence because jails and prisons are fertile recruiting grounds where gang members live in forced proximity to their rivals.[29]

It is important to protect suspects from being compelled to incriminate themselves.  It is also important to protect people in jail from violence and death.  Gilton, and those from rival gangs, all had a legitimate interest that the jail was obligated to protect in waking up alive in the morning.  The deputy served that legitimate and important interest by asking the gang question.  Under both the public safety exception

---

[25] *United States v. Mata-Abundiz*, 717 F.2d 1277, 1280 (9th Cir. 1983) ("Moreover, the questioning conducted by Investigator DeWitt had little, if any, resemblance to routine booking procedures. . . . [A]ny analogy to routine booking procedures is unwarranted.").

[26] *New York v. Quarles*, 467 U.S. 649, 659 n.8 (1984); *see United States v. Brady*, 819 F.2d 884, 888 n.3 (9th Cir. 1987).

[27] *Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 132 S. Ct. 1510, 1518 (2012).

[28] *See Griffin v. Gomez*, 741 F.3d 10, 22 (9th Cir.), *cert. denied sub nom. Griffin v. Beard*, 135 S. Ct. 114 (2014).

[29] *Florence*, 132 S. Ct. at 1518.

and the booking exception, either of which would suffice without the other, *Miranda* did not apply to the question, and the answer was admissible in Gilton's prosecution.